**Jo Lynn FREEMAN, Appellant,**

v.

**William Jerry FREEMAN, Appellee.**

Supreme Court of Kentucky.

Jan. 14, 1977.

Rehearing Denied April 1, 1977.

Frank G. Gilliam, Bradford R. Dennis, Gilliam, Buster & Dennis, Lexington, for appellant.

James Richard Smith, Dayton, Todd, Walter & Cox, Lexington, for appellee.

STEPHENSON, Justice.

This appeal illustrates some of the problems encountered by a trial court dealing with a custody proceeding involving an "interstate child." If nothing else, the circumstances here reveal the intolerable state of affairs resulting from ignoring the orderly processes of law. We are of the opinion the trial court acted properly and affirm the judgment giving full faith and credit to the orders of the Florida court granting custody of the infant child of the parties to the father.

The appellant-mother and the appellee-father, we infer from the record, were married in the state of Florida; and the infant child, the subject of this controversy, was born in the state of Florida. In June 1975, the mother and father were divorced by a judgment of the circuit court of Palm Beach County, Florida. By the terms of the judgment, the mother was granted custody of the infant child, Elizabeth Candace Freeman. The judgment provided for visitation rights to the father from Friday night to Sunday on alternate weekends and for Sunday on the other weekend.

It is apparent from the record that subsequent to the divorce proceedings, the parties' relationship was stormy. The mother has many complaints concerning the conduct of the father including the expressed fear that the father would, on one of the visitation weekends, spirit the child out of the country to Australia or to places un-

known. According to the mother, the father made this threat on more than one occasion.

The mother then proceeded to take steps to remedy the situation. Without any notice to the father or to the circuit court of Palm Beach County, the mother with the child departed from the state of Florida and arrived in Lexington, Kentucky, March 7, 1976, with the intention of establishing her domicile and residence in that city. The mother tells us that there was no contact with the father and that he did not request any visitation between the date of the move to Kentucky and the latter part of June 1976. The father's story seems eminently reasonable to us. He says that after the mother and the child moved from Florida he did not know their whereabouts and spent considerable time and funds locating them. Finally, on June 21, 1976, he located them by telephoning the mother's sister and her mother, who had moved back to Lexington from Florida in December 1975. The father informed them that he intended to be in Lexington on the July 4 weekend and expected to see his daughter who he learned had been enrolled by the mother in a Day Care Center in Lexington as Candy Wickes. About the 30th of June, the mother called the father and informed him that family plans had been made for July 4 and he could not have the daughter visit with him for the weekend, but some arrangement could be made for a visit with the child.

The father then, after notice and motion to compel visitation set for July 2, 1976, procured an order from the circuit court of Palm Beach County, Florida, directing the mother to deliver the daughter to the father for visitation from July 2, 1976, to July 5, 1976. The mother denies receiving notice of the hearing.

Armed with this order, the father proceeded to Lexington to visit with his daughter. On arrival he requested a deputy sheriff to accompany him. He and the deputy proceeded to the residence of the grandmother where the deputy alighted from the car and approached the house. Thereupon,

according to the deputy and the father, the grandmother and two men, all intoxicated, told them to "get the hell out of here" and other threatening remarks. The father then got back into the car and the deputy went to the door and gave the order of the Florida court to the mother, who advised him she would not let the father have the child. Then after saying she would call her attorney, she reappeared and informed the deputy that she did not consider the order valid in Kentucky. The deputy and the father then retired from the scene, the father back to Florida where a hearing was held in the Florida court on the father's motion for contempt and for temporary custody. On August 5, 1976, the Florida court entered an order holding the mother in contempt and granting temporary custody to the father. The scene now shifts back to Lexington where the father filed in the Fayette Circuit Court a petition for writ of habeas corpus and temporary custody based upon the August 5 order of the Florida court. On August 13, 1976, the trial court entered an order giving full faith and credit to the order of the Florida court and awarding custody of the infant to the father. This order was held in abeyance pending a hearing on the merits requested by the mother. The father then filed an amended complaint styled "Petition for Possession of Elizabeth Candace Freeman," which we construe to be an equitable proceeding.

After hearing testimony by the parties, essentially the same as recounted here, the trial court on September 2, 1976, entered an order finding that the Fayette Circuit Court did not have jurisdiction to determine custody, reciting that the proper jurisdiction lies with the Florida court and further ordering the August 13, 1976, order held in abeyance until September 2, 1976, giving the mother an opportunity to resubmit herself to the jurisdiction of the Florida court by filing a motion to be heard in the Florida court, otherwise, the August 13, 1976, order be held in full force and effect.

The scene now shifts back to Florida. The mother filed motion in the circuit court of Palm Beach County to set aside the order

of contempt. After a hearing, the Florida court on September 30, 1976, adjudged the mother in contempt of the court's orders of October 22, 1975, July 2, 1976, and August 5, 1976, for not providing reasonable visitation to the father. The Florida court further ordered the mother to deliver the infant child to Palm Beach County, Florida, by October 7, 1976, so that the father would be afforded his visitation rights. The order further provided that should the mother fail to comply, then permanent custody of the infant would be granted to the father.

On October 13, 1976, the Florida court being informed that the mother had not complied with the order of September 30, 1976, entered an order awarding permanent custody of the child to the father.

As to be expected, the father next filed motion, with the Florida court orders attached, in the Fayette Circuit Court for an order giving full faith and credit to the orders of the Florida court. Then, what do our wondering eyes see but a response by the mother informing the trial court that in an action for custody filed by the mother and assigned to another division of the Fayette Circuit Court, the other division has assumed jurisdiction of the minor child and entered an order granting temporary custody to the mother. Curiously enough, this action was filed on October 7, 1976, the petition for custody rehashing all the facts heard by the trial court and reciting that the appearance before the Florida court did not resolve any issues, although it appears to us that the issue was resolved. There is a further pious recitation that the mother will cooperate with the court on any orders for visitation. It occurs to us that lack of obedience to orders for visitation on the part of the mother is the cause of this bizarre situation.

Not much impressed by this collateral action, the trial court entered an order on November 8, 1976, giving full faith and credit to the orders of the Florida court and awarding the custody of the child to the father.

This chain of events was commenced when the mother, fearful that the father would take the child to places unknown, decided to do just exactly what she feared the father would do. Some indication of the mother's attitude is revealed by her action in putting the child in a Day Care Center under an assumed name.

The situation might still have stabilized if the mother had possessed the good judgment to cooperate with the father's visitation request on July 4. From that point, it is difficult to find any reasonable basis for her actions in attempting to deny for all practical purposes the father's right to visit with his daughter. After failing to convince the Florida court of her position, the filing of a separate action for custody illustrates "shopping for a friendly forum" rampant.

▇ It is an intolerable state of affairs where self-help and the rule of "seize and run" prevail rather than the orderly processes of law. Until the adoption in this Commonwealth of the Uniform Marriage and Divorce Act, KRS Chapter 403, with particular reference to KRS 403.260, Custody, we had no firm guidelines for determining jurisdiction in child custody proceedings or for the purpose of recognizing and giving effect to the orders of courts of other jurisdictions involving the custody of children. The philosophy of the Act is to stabilize and bring some semblance of order into the determination of child custody proceedings, thereby reducing jurisdictional conflict between the various states. We are of the opinion that according to the provisions of the Act, the Florida court has jurisdiction of custody in this case.[1]

1. Florida Statutes, Chapter 61, Dissolution of Marriage, § 61.13 provides in part:

"(2)(a) In any proceeding under this chapter, the court shall have jurisdiction to determine custody, notwithstanding that the child or children are not physically present within this state at the time of filing any proceeding under this chapter, if it shall appear to the court that the child or children were removed from this state for the primary purpose of removing the said child or children from the jurisdiction of

■ We are of the further opinion the trial court acted properly in giving full faith and credit to the orders of the Florida court. Any other disposition by the trial court would have the effect of rewarding the mother for ignoring and attempting to circumvent valid court orders.

Finally, although we are loath to comment in the nature of an advisory opinion, we are faced with a peculiar situation; that is, the mother's obtaining a temporary order of custody in a separate action in another division of the Fayette Circuit Court.

■ We are of the opinion the order for temporary custody obtained by the mother is a nullity in the circumstances presented here, and in order that it not be a source of further complications in this already complex situation, we direct the trial court to give prompt effect to the order entered here and to promptly enter appropriate orders should there be any attempt to use the temporary order of custody obtained by the mother to effect any further delay or hindrance in this case.

We cannot see in this proceeding for temporary custody any conformity to the provisions of KRS 403.260. We note that the 1976 General Assembly by amendment to KRS 403.260 deleted the provisions which in

the absence of the extraordinary circumstance provided for requires a period of six months to confer jurisdiction as the child's "home state." KRS 403.260 otherwise remains as enacted in 1972. We are of the opinion the philosophy of the Act necessitates some period of time before this state becomes the "home state" of the child. Without some time period, the rest of the Act does not make sense. We are not advised whether the General Assembly deemed the six-months period too short or too long. In order to give effect to the Act, we feel that it will be incumbent upon this court in an appropriate case to fill the vacuum and construe the time period necessary to give effect to the spirit of KRS 403.260.

■ For the purposes of our comment on the mother's temporary custody order, we observe that the child and the mother have no significant connection with this state other than the period of time the child was secreted here from the father and before the father commenced his action in court. We do not regard a period of time in this state where a child is hidden from the other parent as having any effect on giving the child a "home state" status.

Our observation is that the "best interest" of the child has been lost in the thicket of the wishes of the parents here. We can

the court in an attempt to avoid a determination of custody.

"(b) The court shall award custody and visitation rights of minor children of the parties as a part of proceeding for dissolution of marriage in accordance with the best interests of the child. Upon considering all relevant factors, the father of the child shall be given the same consideration as the mother in determining custody.

"(3) For purpose of custody, the best interest of the child shall be determined by the court's consideration and evaluation of all factors affecting the best welfare and interests of the child, including, but not limited to:

"(a) The love, affection, and other emotional ties existing between the parents and the child.

"(b) The capacity and disposition of the parents to give the child, love, affection, and guidance and to continue the educating of the child.

"(c) The capacity and disposition of the parents to provide the child with food, clothing, medical care or other remedial care recognized and permitted under the laws of this state in lieu of medical care, and other material needs.

"(d) The length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity.

"(e) The permanence, as a family unit, of the existing or proposed custodial home.

"(f) The moral fitness of the parents.

"(g) The mental and physical health of the parents.

"(h) The home, school, and community record of the child.

"(i) The reasonable preference of the child, if the court deems the child to be of sufficient intelligence, understanding, and experience to express a preference.

"(j) Any other factor considered by the court to be relevant to a particular child custody dispute.

"(4) In any proceeding under this chapter, the court, at any stage of the proceeding and after final judgment, may make such orders about what security is to be given for the care, custody, and support of the minor children of the marriage as from the circumstances of the parties and the nature of the case is equitable."

only hope both parents will refrain from "self-help" in the future and rely on the courts to determine what the parents cannot. The alternative to an orderly judicial process is chaos. Admittedly the system is not perfect; however, it is far better than a series of hide-and-seek situations which are detrimental to the well being of any child.

The judgment is affirmed.

REED, C. J., and JONES, LUKOWSKY, PALMORE, STERNBERG and STEPHENSON, JJ., sitting.

All concur.