384 S.E.2d 151

**Tina Ruth SAMS, formerly Tina Ruth Boston**

v.

**Geary Lee BOSTON.**

**No. 18539.**

Supreme Court of Appeals of West Virginia.

July 27, 1989.

Concurring Opinion Aug. 2, 1989.

case under consideration was a circumstantial one.

order of the Circuit Court of Wood County, West Virginia, with respect to its having subject-matter jurisdiction. On the other hand, we reverse that court's separate order awarding permanent legal custody to the appellee-mother, and remand this case for a full evidentiary hearing to determine which of the parents should obtain permanent legal custody based upon the best interest of the children.

I

The appellee-mother, Tina Ruth Samms, formerly Tina Ruth Boston, filed in the Circuit Court of Wood County, West Virginia, for divorce from the appellant-father, Geary Lee Boston, in October, 1983. The parties had resided in such county and state since at least July, 1972, when they were married there. The only ground alleged initially for the divorce was irreconcilable differences. In the divorce complaint the appellee asked for temporary and permanent legal and physical custody of the three children born of the marriage, namely, Geary Lee Boston, Jr., then age ten (born November 13, 1972), Joseph Daniel Boston, then age nine (born June 23, 1974) and Kristina Ruth Boston, then age three (born July 2, 1980). In November, 1983, the appellant failed to return the three children to the appellee after obtaining only temporary physical custody of them during the exercise of visitation arrangements. He also thereafter secreted himself and the three children from the appellee.

The appellee in December, 1984, amended her divorce complaint to include, as grounds, cruel and inhuman treatment, desertion for six months and separate habitation for over a year. In May, 1985, the Circuit Court of Wood County, West Virginia, granted a divorce to the appellee based upon the one-year separation. The court order was silent as to child custody.[1]

Richard A. Bush, Bush & Trippel, Parkersburg, for Geary Lee Boston.

George E. Lantz, Lantz, Palmer, Tebay & Reed, Parkersburg, for Ruth Sams.

McHUGH, Justice:

This appeal presents an important question under the Uniform Child Custody Jurisdiction Act and under the Parental Kidnapping Prevention Act, specifically, whether a state remains the "home state" of children under those two Acts, for a reasonable period of time, where the children have been abducted to and concealed in another state by one of the parents. Holding in the affirmative, we affirm the

1. The divorce commissioner had, erroneously, recommended to the court that no order relative to child custody should be entered because of the children's and the appellant's absence from the jurisdiction throughout the divorce proceedings. Under *W.Va.Code*, 48-10-3(c) [1981], the physical presence of the child in this state, while desirable, is not a prerequisite for jurisdiction to determine his or her custody. Similarly, *W.Va. Code*, 48-10-5 [1981] sets forth certain methods of giving notice required for the exercise of jurisdiction over a person outside this state who does not submit to the jurisdiction of a court in this state.

From November, 1983, until December, 1986, the appellee attempted to ascertain the whereabouts of the children and the appellant. In December, 1986, she finally located them in Crawfordville, Wakulla County, Florida. In order for the appellant to agree to the children's visitation with the appellee during the next summer, the appellee executed a written agreement not to seek permanent legal custody of the children.

The children came to visit the appellee in Wood County, West Virginia, in June, 1987. In July, 1987, the appellee, still having physical custody of the children, filed in Wood County, West Virginia, a petition for modification of the May, 1985 divorce decree, so as to obtain permanent legal, as well as physical, custody of the children and child support from the appellant. In that petition the appellee alleged that she had been the primary caretaker of the children until the appellant "snatched" them in November, 1983, and that she would be a fit and proper custodian of the children.

The appellant filed a motion to dismiss for *"forum non conveniens"* and "to enforce stipulation of visitation," alleging (1) that Florida was the "home state" of the children under the Uniform Child Custody Jurisdiction Act ("the UCCJ Act"), adopted by both the State of West Virginia [2] and the State of Florida,[3] and alleging (2) that the appellee had violated the visitation agreement by seeking permanent legal custody of the children. Counsel for the appellant made a so-called "special appearance" at a hearing on August 10, 1987 before a family law master in Wood County, West Virginia. The family law master, on August 11, 1987, denied the appellant's motion to dismiss and for enforcement of the "stipulation of visitation."

A hearing was subsequently held before the family law master, on August 18, 1987, on the appellee's petition for child custody. The appellant was not personally present but his West Virginia attorney noted a so-called "special appearance." The appellee had notified the appellant of the hearing by certified mail, and the appellant's signature is on the return receipt card. In addition, the appellant called the appellee to acknowledge receipt of the notice of hearing and to inform the appellee that he would not personally attend the hearing.[4]

At the August 18, 1987 hearing the appellee testified that she had been the primary caretaker of the children until the appellant abducted them in November, 1983.[5] She also testified that she was

---

**2.** *W.Va.Code,* 48–10–1 to 48–10–26 [1981] is this state's codification of the UCCJ Act.

**3.** *Fla.Stat.Ann.* §§ 61.1302 to 61.1348 (West 1985) is Florida's codification of the UCCJ Act.

**4.** *W.Va.Code,* 48–10–5 [1981] provides in pertinent part:

(a) Notice required for the exercise of jurisdiction over a person outside this State shall be given in a manner reasonably calculated to give actual notice and may be:

. . . .

(3) By any form of mail addressed to the person to be served and requesting a receipt;

. . .

(c) ... If service is made by mail, proof may be a receipt signed by the addressee or other evidence of delivery to the addressee.

(d) Notice is not required if a person submits to the jurisdiction of the court.

In the sole syllabus point of *McAtee v. McAtee,* 174 W.Va. 129, 323 S.E.2d 611 (1984), this Court held that a court may award custody of a child in an interstate custody dispute without having personal jurisdiction of an out-of-state parent,

as long as there is compliance with the notice provisions of *W.Va.Code,* 48–10–5 [1981].

**5.** With reference to the initial award of permanent legal custody of very young children, it is rebuttably presumed that it is in the best interest of such children to be placed in the custody of their primary caretaker, if he or she is fit. Syl. pt. 2, *Garska v. McCoy,* 167 W. Va. 59, 278 S.E.2d 357 (1981). *Accord,* syl. pt. 1, *Mills ex rel. Gorrick v. Gorrick,* 181 W.Va. 158, 381 S.E.2d 273 (1989). "Very young children" or "children of tender years" is a term which is somewhat elastic; it includes an infant in the suckling stage and excludes an adolescent fourteen years of age or older; between these two extremes, there is an age range for which the trial court must consider the maturity of the child to express intelligently and voluntarily a preference for one parent as his or her custodian. Syl. pt. 7, *Garska v. McCoy.* At the time of the August, 1987 custody-determination hearing in Wood County, West Virginia, the children were, respectively, fourteen, thirteen and seven years of age. Therefore, at that time, the primary-caretaker presumption did not apply to the oldest child, and the family law master

working as a secretary and that she had signed the agreement not to seek permanent custody of the children because she did not have any other choice in order to see the children.

The oldest child, Geary, Jr., also testified at that hearing. He was fourteen years old at the time of the hearing. He testified that he preferred to stay with his mother. His only stated reason was "to get reacquainted with" her. He admitted that his father treated him well and that he liked the school he attended in Florida.[6]

On August 18, 1987, during the custody-determination hearing, the family law master received information that a child custody proceeding had been brought in Florida, by the appellant, *after* the appellee's petition for child custody had been filed in West Virginia. The family law master, on August 19, 1987, sent a letter to the Florida circuit court judge (Wakulla County) informing the latter of the pending West Virginia child custody proceeding.[7] In his letter to the Florida judge the family law master opined that, upon the facts recited in the letter, West Virginia was the "home state" under the UCCJ Act (when the divorce action was filed) and that although the children had substantial contacts with Florida, West Virginia was the more appropriate forum for deciding child custody due to the appellant's "inequitable conduct" of absconding with the children and concealing their whereabouts. The Florida court did not respond.[8]

The Florida court stayed its proceedings until it received notice of the West Virginia family law master's recommended decision. The master, in August, 1987, recommended that West Virginia had jurisdiction under the UCCJ Act as either the "home state" or the "significant-connection" state.[9] The

---

would have also been entitled to weigh the testimony of the other two children if they had testified and were sufficiently mature to express a custodial preference. Only the oldest child was present and testified at the hearing.

**6.** This Court has offered some guidelines on weighing the expressed preference of a child for a certain parent to be his or her custodian. *Rose v. Rose,* 176 W. Va. 18, 21 n. 4, 340 S.E.2d 176, 179 n. 4 (1985).

**7.** Before determining whether to decline or retain jurisdiction, the court may communicate with a court of another state and exchange information pertinent to the assumption of jurisdiction by either court with a view to assuring that jurisdiction will be exercised by the more appropriate court and that a forum will be available to the parties. *W.Va.Code,* 48–10–7(d) [1981].

**8.** If the court is informed during the course of the proceeding, that a proceeding concerning the custody of the child was pending in another state before the court assumed jurisdiction, it *shall* stay the proceeding *and communicate* with the court in which the other proceeding is pending, to the end that the issue may be litigated in the more appropriate forum and that information may be exchanged in accordance with other sections of the UCCJ Act. *Fla.Stat.Ann.* § 61.-1314(3) (West 1985); *W.Va.Code,* 48–10–6(c) [1981]. The pendency of any simultaneous custody proceedings should require some communication between the courts. Where one of the courts has no legitimate claim to jurisdiction, the other court would simply point this out and add that any decree emanating from unautho-

rized proceedings would not be entitled to recognition under the UCCJ Act. Bodenheimer, *Interstate Custody: Initial and Continuing Jurisdiction Under the UCCJA,* 14 Fam.L.Q. 203, 212 (1981).

**9.** *W.Va.Code,* 48–10–2(5) [1981] defines the "home state" of a child for purposes of child custody determination under the UCCJ Act to mean

the state in which the child immediately preceding the time involved lived with his parents, a parent or a person acting as a parent for at least six consecutive months and, in the case of a child less than six months old, the state in which the child lived from birth with any of the persons named. Periods of temporary absence of any of the named persons are counted as part of the six-month or other period[.]

The "time involved" within the meaning of this definition of "home state" is the date when the custody proceeding at issue was brought. *See, e.g., Tufares v. Wright,* 98 N.M. 8, 10–11, 644 P.2d 522, 524–25 (1982).

The "significant-connection" state of a child for purposes of child custody determination under the UCCJ Act is the state in which (1) the child and his parents, or the child and at least one contestant, have (2) a significant connection with that state, and (2) there is substantial evidence available in that state concerning the child's present or future care, protection, training and personal relationships, so that (3) it is in the best interest of the child that a court in that state assume jurisdiction. *W.Va.Code,* 48–10–3(a)(2) [1981]. Despite the label of "significant connection," which is an undefined term,

master also recommended that permanent legal custody of the children be awarded, for the first time, to the appellee. The Circuit Court of Wood County, West Virginia, agreed with the master's recommendations and entered orders on the jurisdiction and custody-determination questions on October 1, 1987.

The Florida circuit court (Wakulla County), on September 4, 1987, entered its "order on motion to determine jurisdiction," wherein that court determined that Florida was the "home state" of the children; that the appellant, "as natural parent," "moved with his children to Crawfordville, Florida, in June, 1984," (from December, 1983 until June, 1984 the court found that the appellant and the children had been in Wirt County, West Virginia); that the appellee had "abandoned" her plea for child custody when the May, 1985 divorce decree failed to name her as custodian; that the August 18, 1987 recommendation of the West Virginia family law master as to child custody was not entitled to full faith and credit under the federal statute known as the Parental Kidnapping Prevention Act of 1980 ("the Federal PKP Act"), as West Virginia was not the home state and had not been the home state within six months of the West Virginia child custody proceeding brought in July, 1987;[10] that irrespective of the allegation that the appellant had wrongfully removed the children from West Virginia, the UCCJ Act and the Federal PKP Act do not contemplate "punitive" decrees against a parent but, instead, contemplate decrees based upon the state having the most significant connection with the children.

In January, 1988, the Florida circuit court (Wakulla County) entered a final order awarding permanent legal custody to the appellant. In that order that court found that the appellant's occupation as a lineman allowed him to provide well for the children; that the home environment in Florida had been loving and stable; that the children liked their schools in Florida and were actively involved in school and other activities in Florida. Interestingly, the court, which had, as stated above, expressed earlier that the UCCJ Act and the Federal PKP Act did not contemplate "punitive" decrees, emphasized in this custody-determination order that the appellee had not allowed the children to have free and uncensored telephone conversations with the appellant during the time they have been in West Virginia with the appellee (since June, 1987).

The oldest child, now sixteen years of age, has continued to live with the appellee-mother since June, 1987. The middle child, now fifteen years of age, returned to Florida with the appellant-father for a time but is now back voluntarily with his mother. The youngest child, the now nine-year-old daughter, was, on an unspecified date, abducted again from the appellee-mother by the appellant-father, and she remains presently in Florida with him. For this last abduction, the appellant has been indicted under *W. Va. Code*, 61–2–14d [1984] for the felony of concealing or removing a minor child in violation of a court order and with the intent to deprive another person of lawful custody or visitation rights.

The appellant-father brought this appeal to challenge the jurisdiction and custody-determination orders of the Wood County, West Virginia, Circuit Court.

---

the gravamen of this possible alternative to "home-state" jurisdiction under the UCCJ Act is to determine which state has the greatest degree of access to relevant evidence to promote the best interest of the child; under the UCCJ Act, the "significant-connection" state may or may not be the "home state." *See McAtee v. McAtee,* 174 W.Va. 129, 133, 323 S.E.2d 611, 615 (1984). The UCCJ Act therefore recognizes that two states may have concurrent jurisdiction to determine child custody, the "home state" and the "significant-connection" state, with other sections of the Act being designed to result in only one court exercising jurisdiction. *McAtee,* 174 W.Va. at 133 n. 2, 323 S.E.2d at 615 n. 2.

**10.** The definition of the child's "home state" under the Federal PKP Act, 28 *U.S.C.* § 1738A(b)(4) (1982), is identical to the UCCJ Act's definition thereof. *See supra* note 9. Unlike the UCCJ Act, the Federal PKP Act, for mandatory "full faith and credit" purposes, recognizes "significant-connection" jurisdiction only if there is no "home-state" jurisdiction at the time involved. *See* 28 *U.S.C.* § 1738A(c)(2)(B) (1982).

## II

■ The purpose of the Federal PKP Act was to provide for mandatory nationwide enforcement of custody orders made in accordance with the terms of the UCCJ Act, in order to discourage interstate forum shopping in child custody cases and, more importantly, in the context of a "national epidemic of parental kidnap[p]ing," to " 'eliminate the incentive for one parent to remove a minor child to another jurisdiction.' " *Thompson v. Thompson*, 484 U.S. 174, 182, 108 S.Ct. 513, 517–18, 98 L.Ed.2d 512, 521–22 (1988) (interior citation omitted). Stated more concisely, "[t]he underlying policy behind the PKPA is to deter, if not prevent, 'child snatching[.]' " *State ex rel. Valles v. Brown*, 97 N.M. 327, 329, 639 P.2d 1181, 1183 (1981).

The policy underlying the UCCJ Act of 1968 is the same:

Physical presence of the child [traditionally] opens the doors of many courts to the petition[er] and often assures him [or her] of a decision in his [or her] favor. It is not surprising then that custody claimants tend to take the law into their own hands ... [by] resort[ing] to self-help in the form of child stealing, kidnapping, or various other schemes to gain possession of the child....

To remedy this intolerable state of affairs where self-help and the rule of 'seize-and-run' prevail rather than the orderly processes of the law, uniform legislation has been urged in recent years to bring about a fair measure of interstate stability in custody awards.

Uniform Child Custody Jurisdiction Act commissioners' prefatory note, 9 *U.L.A.* 113 (1979). *See also McAtee v. McAtee*, 174 W.Va. 129, 133, 323 S.E.2d 611, 615 (1984); *Brockman v. Hegner*, 173 W.Va. 431, 433, 317 S.E.2d 516, 519 (1984); *Shermer v. Cornelius*, 167 W.Va. 46, 52, 278 S.E.2d 349, 352 (1981). Indeed, the first and fifth stated purposes of section 1(a) of the UCCJ Act condemn "child-snatching":

(a) The general purposes of this Act are to:

(1) avoid jurisdictional competition and conflict with courts [of other states] in matters of child custody which have in the past resulted in the shifting of children from state to state with harmful effects on their well-being;

. . . .

(5) deter abductions and other unilateral removals of children undertaken to obtain custody awards[.]

*See also W.Va.Code*, 48–10–1(a)(1) & (5) [1981]; *Fla.Stat.Ann.* § 61.1304(1) & (5) (West 1985). Snatched children suffer psychological damage which is often severe and sometimes irreversible and irreparable. *State ex rel. Valles v. Brown*, 97 N.M. 327, 330, 639 P.2d 1181, 1184 (1981).

■ To the extent that the requirements of the Federal PKP Act and of the UCCJ Act do not conflict, the statutes are complementary. However, in cases of conflict, the Federal PKP Act, under the supremacy clause of the *Constitution of the United States*, preempts the UCCJ Act of the respective states.[11] *See Arbogast v. Arbogast*, 174 W.Va. 498, 502, 327 S.E.2d 675, 679 (1984).

The UCCJ Act establishes requirements for obtaining subject-matter jurisdiction in an initial or modification proceeding involving an interstate custody dispute. Under section 3(a)(1) of the UCCJ Act, the first basis for subject-matter jurisdiction in a proceeding to obtain an initial custody decree is "home-state" jurisdiction. The West Virginia enactment of this portion of the UCCJ Act is set forth in *W.Va.Code*, 48–10–3(a)(1) [1981]:

(a) A court of this State which is competent to decide child custody matters has jurisdiction to make a child custody determination by initial or modification decree if:

(1) This State (i) is the home state of the child at the time of commencement of the proceeding or (ii) has been the child's home state within six months before commencement of the proceeding [and] the child is absent from this State because of his removal or retention by a

---

11. The supremacy clause is set forth in *U.S. Const.* art. VI, cl. 2.

person claiming his custody or for other reasons[,] and a parent or person acting as parent continues to live in this State[.]

*See also Fla.Stat.Ann.* § 61.1308(1)(a)(1)–(2) (West 1985). *See supra* note 9 for the West Virginia statutory definition of "home state"; *Fla.Stat.Ann.* § 61.1306(5) (West 1985) provides an identical definition of "home state." The other jurisdictional bases under the UCCJ Act are not pertinent here.

For a state's initial custody decree to be entitled under the Federal PKP Act to enforcement and nonmodification in another state, the initial-decree state must have exercised jurisdiction consistent with the Federal PKP Act:

(a) The appropriate authorities of every State shall enforce according to its terms, and shall not modify except as provided in subsection (f) of this section, any child custody determination made consistently with the provisions of this section by a court of another State.

. . . .

(c) A child custody determination made by a court of a State is consistent with the provisions of this section only if—

(1) such court has jurisdiction under the law of such State; and

(2) one of the following conditions is met:

(A) such State (i) is the home State of the child on the date of the commencement of the proceeding, or (ii) had been the child's home State within six months before the date of the commencement of the proceeding and the child is absent from such State because of his removal or retention by a contestant or for other reasons, and a contestant continues to live in such State;

(B)(i) it appears that no other State would have jurisdiction under subparagraph (A), and (ii) it is in the best interest of the child that a court of such State

assume jurisdiction because (I) the child and his parents, or the child and at least one contestant, have a significant connection with such State other than mere physical presence in such State, and (II) there is available in such State substantial evidence concerning the child's present or future care, protection, training, and personal relationships[.]

28 *U.S.C.* § 1738A(a) & § 1738A(c)(1)–(2)(A) & (B) (1982).[12]

▮ This language indicates that, unlike the UCCJ Act, which accords equal weight to its several jurisdictional bases, the Federal PKP Act gives a distinct priority to the state court exercising "home-state" jurisdiction to enter an initial custody decree. Therefore, the Federal PKP Act makes it judicially imprudent for a state court in one state to exercise jurisdiction to enter an initial custody decree when a state court in another state has "home-state" jurisdiction and has not declined to exercise that jurisdiction; if conflicting decrees were issued, only the custody decree of the "home-state" court would be entitled to full faith and credit under the Federal PKP Act. *Mancusi v. Mancusi,* 136 Misc.2d 898, 901–04, 519 N.Y.S.2d 476, 478–79 (Fam.Ct.1987).

In the case now before this Court the question is whether West Virginia was still the "home state" of the children at the time the appellee-mother brought the July, 1987 custody proceeding in West Virginia to obtain an initial child custody decree.[13] The appellant-father contends that the "home state" of the children shifted from West Virginia to Florida six months after the appellant, in June, 1984, secretly removed the children from West Virginia to Florida to live with him there. The appellant stresses the fact that the appellee did not commence a custody proceeding for an initial decree within six months after the children had been removed from West Vir-

**12.** Other parts of the Federal PKP Act are not pertinent here.

**13.** It is uncontroverted that West Virginia was the "home state" of the children in October, 1983, when the appellee-mother brought her action in West Virginia seeking a divorce from the appellant-father and seeking temporary and per-

manent legal and physical custody of the children. The record before us does not clearly establish whether the Circuit Court of Wood County, West Virginia, had ever granted the appellee's request, in October, 1983, for temporary custody.

ginia, as well as the fact that the children had been back in West Virginia for only about a month at the time the appellee brought her July, 1987 custody proceeding for an initial decree. Consequently, the appellant argues that the Florida, not the West Virginia, initial custody decree was based upon "home-state" jurisdiction as set forth in both the Federal PKP Act and the UCCJ Act. We disagree.

"Home-state" jurisdiction under both the Federal PKP Act and the UCCJ Act is technically possessed by a court in the state where the child lived for six consecutive months immediately preceding commencement of the custody proceeding, extended to include the six-month period immediately following removal of the child from that state. The commissioners' note to section 3 of the UCCJ Act gives the rationale for this jurisdictional basis:

A 6–month period has been selected in order to have a definite and certain test which is at the same time based on a reasonable assumption of fact.... 'Most American children are integrated into an American community after living there six months; consequently this period of residence would seem to provide a reasonable criterion for identifying the established home.'

Subparagraph (ii) of paragraph (1) extends the home state for an additional six-month period in order to permit suit in the home state after the child's departure. The main objective is to protect a parent who has been left by his [or her] spouse taking the child along. The provision makes clear that the stay-at-home parent, if he [or she] acts promptly, may start proceedings in his own state if he [or she] desires, ... This changes the law in those states which required the presence of the child as a condition for jurisdiction and consequently forced the person left behind to follow the departed person to another state, perhaps to several states in succession.

The interior quote with respect to children's integration into a community is from a law review article by Professor Ratner, who was one of the principal consultants to the National Conference of Commissioners on Uniform State Laws for the UCCJ Act.

It is significant, however, that Professor Ratner has also rejected a "bright line" six-month standard for shifting of "home-state" jurisdiction where concealment, that is, "child-snatching," is involved. "Postponement of the initial custody determination, with resultant child instability, is discouraged by the prospect of such a jurisdictional shift, and unilateral child removal is not encouraged by that prospect, because for *at least* six months the stay-at-home parent can petition at home." Ratner, *Procedural Due Process and Jurisdiction to Adjudicate: ... (b) The Uniform Child Custody Jurisdiction Act*, 75 Nw. U.L.Rev. 363, 386 n. 112 (1980) (emphasis added). He recommends the exclusion of concealment periods from the six-month-home period, otherwise, "concealment after removal is encouraged;" therefore, initial jurisdiction is in the state where a claimant resides and the child last resided with a parent or acting parent for "at least" six consecutive months "with the knowledge of the other claimants[.]" *Id.* at 411, 412.

The late Professor Bodenheimer, the reporter for the UCCJ Act, agreed. In condemning the asylum state's assumption of jurisdiction where there has been "child-snatching" prior to the initial custody decree, "perhaps the fastest growing breed" of "child-snatchers," she stated that "[t]he issue of custody is to be settled at *home,* that is, in the *state where the parents lived with the children as a family.*" Bodenheimer, *Interstate Custody: Initial Jurisdiction and Continuing Jurisdiction Under the UCCJA,* 14 Fam.L.Q. 203, 226 (1981) (emphasis added).

The courts, too, are increasingly "concerned that the PKPA and the UCCJA [, if applied too technically,] reduce the issue of [subject-matter] jurisdiction to a mathematical formula, i.e., six months' residence in another State equals a loss of [such] jurisdiction for all purposes." *Dennis v. Dennis,* 366 N.W.2d 474, 477 (N.D.1985) (Vande Walle, J., joined by Gierke, J., concurring specially).

The traditional "solution" for pre-decree "child-snatching" has been to rely upon section 8(a) of the UCCJ Act, codified in *W. Va. Code,* 48–10–8(a) [1981] and in *Fla. Stat.Ann.* § 61.1318(1) (West 1985), which provides: "If the petitioner for an initial decree has wrongfully taken the child from another state or has engaged in similar reprehensible conduct[,] the court [in the asylum state] may decline to exercise jurisdiction if this is just and proper under the circumstances." The commissioners' note to this part of this section explains the concept:

> Subsection (a) extends the clean hands principle to cases in which a custody decree has not yet been rendered in any state. For example, if upon a de facto separation the wife returned to her own home with the children without objection by her husband and lived there for two years without hearing from him, and the husband without warning forcibly removes the children one night and brings them to another state, a court in that state although it has jurisdiction after 6 months may decline to hear the husband's custody petition. 'Wrongfully' taking under this subsection does not mean that a 'right' has been violated—both husband and wife as a rule have a right to custody until a court determination is made—but that one party's conduct is so objectionable that a court in the exercise of its inherent equity powers cannot in good conscience permit that party access to its jurisdiction.

Thus, under this provision, the Florida court, in its opinion, was authorized, but not required, to decline to exercise "home-state" jurisdiction which it possessed in this case. The Florida court believed that Florida technically had become the "home state" of the children in December, 1984, and that Florida technically had been the "home state" of the children within six months of their "wrongful" retention by the appellee-mother in West Virginia in the summer of 1987. We disagree with this

technical, mathematical formula approach to subject-matter jurisdiction under the Federal PKP Act and the UCCJ Act in the context of "child-snatching."

Other courts have also refused to be so technical in deciding whether subject-matter jurisdiction exists in the context of "child-snatching." For example, in *Freeman v. Freeman,* 547 S.W.2d 437 (Ky. 1977), the court held: "We do not regard a period of time in this state where a child is hidden from the other parent as having any effect on giving the child a 'home state' status." *Id.* at 441. Similarly, "we have little doubt that, if the children were wrongfully taken [out of state], this period would not affect the status of Tennessee as their home state of residence under the PKPA and the UCCJA." *Hooks v. Hooks,* 771 F.2d 935, 949 n. 14 (6th Cir.1985). Akin to this approach "tolling" the shift of "home-state" jurisdiction during concealment, and placing an outer limit upon such tolling, is the approach taken in *Grubs v. Ross,* 291 Or. 263, 630 P.2d 353 (1981), wherein the court held that "home-state" jurisdiction continues for a reasonable period of time following the abduction and concealment of the child out of state, with an outer limit of three to four years. *Id.* at 276, 279–80 & n. 22, 630 P.2d at 361, 363 & n. 22, *citing,* for the three-to-four-year outer limit, Bodenheimer, *Progress Under the Uniform Child Custody Jurisdiction Act and Remaining Problems: Punitive Decrees, Joint Custody, and Excessive Modifications,* 65 Cal.L.Rev. 978, 989 (1977).[14]

A leading case from the State of California also refused to look exclusively to the passage of time, without considering whether the children got to a state by child-snatching. In *In re Marriage of Hopson,* 110 Cal.App.3d 884, 168 Cal.Rptr. 345 (1980), the court acknowledged that a "technical application" could be held to confer "significant-connection" jurisdiction on a court in the state to which the children had been abducted by a parent. *Id.* at 895, 168 Cal.Rptr. at 353. The court, relying

---

**14.** This Court realizes that the *Grubs v. Ross* case involved a custody proceeding to obtain a modification, as opposed to an initial, decree. This distinction is without legal significance here, for "home-state" jurisdiction applies "to make a child custody determination by initial or modification decree," according to section 3(a) of the UCCJ Act.

expressly upon the intent of the UCCJ Act to deter abductions, refused, however, to recognize the asylum state's jurisdiction. "In the long run, refusal to condone abduction provides better stability for children who would otherwise remain subject to the exercise of lawless self-help by their embattled parents." *Id.* at 897, 168 Cal.Rptr. at 354.

Noting that the stay-at-home parent had brought her custody proceeding within nineteen months, but not within six months, after the children's abduction to another state by their father, the *Hopson* court concluded: "While it is unfortunate that the mother did not seek enforcement earlier . . ., she should not be penalized for not utilizing an advantageous procedure offered to her." *Id.* at 904, 168 Cal.Rptr. at 359.

Another leading case in this area is *Nehra v. Uhlar*, 43 N.Y.2d 242, 372 N.E.2d 4, 401 N.Y.S.2d 168 (1977). In that case the mother had absconded with the children and had concealed their whereabouts in another state. The father did not locate the children until more than nine months later. Shortly thereafter the mother brought a custody proceeding in the asylum state of New York. By the time the New York Court of Appeals issued its opinion, the children had been living with the mother in New York for over four and a half years, and the record indicated that the mother during that time had provided her children with a good home.

The New York Court of Appeals refused to modify the existing custody decree of a Michigan court awarding custody to the father. The court held that the mother's physical custody of the children for the preceding four and a half years, without more, was not a change in circumstances sufficiently extraordinary to justify upsetting the determination of the Michigan court. "If it were, a parent, having lost [or apprehensive of losing] a custody dispute in another State, might believe that by abducting the children, secreting them in New York, and waiting for time to pass, the prior [or contemplated] custody decree could be effectively nullified [or avoided]."

*Id.* at 250, 372 N.E.2d at 8, 401 N.Y.S.2d at 172. The court did observe that if "just too many years had passed, even the unlawful act [of abducting the children] might have to be ignored[.]" *Id.* at 251, 372 N.E.2d at 8, 401 N.Y.S.2d at 173.

In reaching its holding the New York Court of Appeals in *Nehra v. Uhlar* stressed the deterrence of child-snatching to promote the best interest of all children: "This Court has recognized that if the best interest of all children are to be served, the abduction of children to avoid the effect of custody decrees must be deterred[.]" *Id.* at 249, 372 N.E.2d at 7, 401 N.Y.S.2d at 172. There may be cases, though, where the tension between the goals of deterring child-snatching and promoting the interest of the particular children in a stable home environment should be resolved in favor of the latter. "[T]he apparent imperative to discourage abduction must, when necessary, be submerged to the paramount concern in all custody matters: the best interest of the child." *Id.* at 250, 372 N.E.2d at 8, 401 N.Y.S.2d at 172.

It is interesting to note that the same parties were also involved in *Nehra v. Uhlar*, 168 N.J.Super. 187, 402 A.2d 264 (App. Div.), *petition for certification denied*, 81 N.J. 413, 408 A.2d 807 (1979), wherein that court concluded that the mere passage of so many years (more than six) during which the children had remained in the physical custody of the mother was sufficient to mandate a full inquiry into the best interest of the children. *Id.* at 194–95, 402 A.2d at 268. As to the fact that the children had been abducted by the mother, the New Jersey court, in requiring a hearing on the best interest of the children, remarked:

[T]he welfare of the children is paramount. Their welfare should not be sacrificed on the altar of judicial punishment of a parent for her wrongdoing in removing the children from a foreign jurisdiction, or in violating the order of a foreign court.

. . . .

We do not overlook nor condone the actions of the mother, or the fact that

granting custody to her would in effect reward her for utilizing unlawful self-help in defying the orders of other courts and engaging in forum shopping by invoking the jurisdiction of courts of three states. Nevertheless, the paramount issue before the trial court and this court is necessarily the welfare of the children rather than the tactics of their parent. Thus, despite the improprieties of the mother and their impact upon the rights of the father, the court must primarily concern itself with the children and their welfare in this tragic and unfortunate custody struggle.

*Id.* at 194, 196, 402 A.2d at 267, 268–69 (citations omitted).[15]

The issue is, though, in which state should the evidentiary hearing on the best interest of the children be conducted? We are not persuaded by the suggestion that a court in the state to which the children were abducted should be allowed to try the custody case solely because the children's welfare is the controlling guide. "The court in State A [from which the children were abducted] knows as well as the court in state B [to which the children were abducted] that the child's welfare is the controlling guide." *Reed v. High,* 254 Pa.Super. 367, 370, 385 A.2d 1384, 1385 (1978) (Spaeth, J., joined by Cercone, J., concurring). Moreover, various sections of the UCCJ Act are designed to assure that the parties, the children and the evidence will be available to the court exercising jurisdiction, so that the ultimate question, the best interest of the children, can be decided on an appropriate record.

Child-snatching itself has an impact upon the "best interest" of a child. This Court, in *Lemley v. Barr,* 176 W.Va. 378, 343

S.E.2d 101 (1986), although not confronted with child-snatching in that case, recognized this point:

'The resolution of cases must not provide incentives for those likely to take the law into their own hands. Thus, those who obtain custody of children unlawfully, particularly by kidnapping, violence, or flight from the jurisdiction of the courts, must be deterred. Society may not reward, except at its peril, the lawless because the passage of time has made correction inexpedient.... Yet, even then, circumstances may require that in the best interest of the child, the unlawful acts be blinked[.]'

*Id.* 176 W.Va. at 385, 343 S.E.2d at 108, *quoting Bennett v. Jeffreys,* 40 N.Y.2d 543, 550, 356 N.E.2d 277, 284, 387 N.Y.S.2d 821, 827 (1976). Child-snatching is to be deterred, not primarily because of the affront to the dignity of the courts of a given state, but primarily because of its strong adverse effects upon the best interest of the child. A parent's " 'very act of preventing ... children ... from seeing and being with their [other parent] is an act so inconsistent with the best interests of the children as to, per se, raise a strong probability that the [abducting parent] is unfit to act as custodial parent.' " *Arbogast v. Arbogast,* 174 W.Va. 498, 505, 327 S.E.2d 675, 682–83 (1984), *quoting Entwistle v. Entwistle,* 61 A.D.2d 380, 384–85, 402 N.Y.S.2d 213, 215–16 (1978). The abducting parent's "reprehensible conduct was far more insulting to [his] child[ren] than to any court." *Arbogast,* 174 W.Va. at 505, 327 S.E.2d at 683. *See also* Note, *The Parental Kidnap[p]ing Prevention Act: Application and Interpretation,* 23 J.Fam.L. 419, 435 & n. 65 (1984) (victim of child-

---

**15.** Other cases emphasizing the children's interest in a stable home environment and holding that the state to which the children were abducted has the subject-matter jurisdiction over the child custody dispute as, technically, the "home state" include *Bosse v. Superior Court,* 89 Cal. App.3d 440, 152 Cal.Rptr. 665 (1979); *but see* the *Hopson* case, discussed above in the text, decided later by the same court; *Mainster v. Mainster,* 466 So.2d 1228 (Fla.Dist.Ct.App.1985); *but see Mondy v. Mondy,* 428 So.2d 235 (Fla. 1983) (a circuit court in that state should refuse to exercise jurisdiction to modify a custody decree of another state having jurisdiction when

Florida petitioner has "snatched" children to Florida, "the kind of conduct which the UCCJA was designed to discourage[,]" *id.* at 238); *Snow v. Snow,* 369 N.W.2d 581 (Minn.Ct.App.1985); *Pierce v. Pierce,* 197 Mont. 16, 640 P.2d 899 (1982) (declining to follow the *Freeman* case, discussed above in the text, as the UCCJ Act does not support the "tolling" of the shift of "home-state" jurisdiction; based upon the authorities discussed in the text, we disagree). *See generally* annotation, *Validity, Construction, and Application of Uniform Child Custody Jurisdiction Act,* 96 A.L.R.3d 968 (1979 and Supp.1988).

snatching will have difficulty developing a normal relationship with either parent; child-snatching has been classified by some as a form of child abuse).

Because our decision is based primarily upon a concern for the best interest of the children, rather than primarily upon punishing the appellant for child-snatching, there is no "punitive" decree problem here. A child custody decree is "punitive" only if it, without due regard to the best interest of the child, was based primarily upon punishing one parent for disregarding the court's authority or primarily upon punishing one parent for departing from the jurisdiction with the child, whether or not the departure contravened a court order. *Arbogast v. Arbogast*, 174 W.Va. 498, 505, 327 S.E.2d 675, 682 (1984), *quoting Spaulding v. Spaulding*, 460 A.2d 1360, 1367 (Me.1983). Some courts have held that a "punitive" decree need not be given full faith and credit under the UCCJ Act. On the other hand, the Federal PKP Act makes no distinction between punitive decrees and other child custody decrees; it requires that a custody decree of another state be given full faith and credit if such decree meets the requirements of the Federal PKP Act. *Arbogast v. Arbogast*, 174 W.Va. 498, 505, 327 S.E.2d 675, 683 (1984). *See also Belosky v. Belosky*, 97 N.M. 365, 368, 640 P.2d 471, 474 (1982). In any event, the child custody decree to be entered by the Circuit Court of Wood County, West Virginia, after remand for a full evidentiary hearing on the current best interest of the children, would not be a "punitive" decree.[16]

What was said in *Nehra v. Uhlar*, 43 N.Y.2d 242, 372 N.E.2d 4, 401 N.Y.S.2d 168 (1977), is equally applicable here:

This case, like most child custody matters, involves a collision of principles as well as of intransigent would-be custodians of the hapless children, innocent subjects of a conflict they can never understand. The primary principle of the child's best interest is never easily applied once the litigants themselves have succeeded in creating the disruption of shifting custody as has happened in this case. The courts can only repair, patch, and cover over, as best they can, the irreparable harm occasioned and reduce the harm to a minimum, if the minimum is discernible.

. . . .

... The courts cannot assure the happiness and stability of these children; that only their parents could have done, and, hopefully, can still do.

*Id.* at 251, 252, 372 N.E.2d at 8–9, 401 N.Y.S.2d at 173.

▮ Based upon all of the above, this Court holds that a state remains the "home state" of the children, for purposes of the Uniform Child Custody Jurisdiction Act, specifically, *W. Va. Code*, 48–10–2(5) and 48–10–3(a)(1) [1981], and for purposes of the Parental Kidnapping Prevention Act, specifically, 28 *U.S.C.* § 1738A(b)(4) and § 1738A(c)(2)(A) (1982), for a reasonable period of time, where the children have been abducted to and concealed in another state by one of the parents. The approximately three-and-a-half-year lapse of time before the appellee commenced the proceeding in July, 1987 for an initial custody decree was a reasonable period of time under the circumstances of this case.

Accordingly, we affirm the order of the Circuit Court of Wood County, West Virginia, declaring that it has subject-matter jurisdiction over this interstate child-custody dispute. On the other hand, for the reasons expressed in note 16 *supra,* we reverse that court's separate order awarding permanent legal custody of the children to the appellee, and remand this case for a full evidentiary hearing to determine which of the parents should obtain permanent legal and physical custody based upon the current best interest of the children.

---

**16.** About two years have passed since the Circuit Court of Wood County, West Virginia, conducted its custody-determination hearing. In addition, only the oldest child testified at that hearing, and his testimony was quite vague. On remand there should be an attempt to obtain the testimony of all three children, following the guidelines of the UCCJ Act for acquiring such testimony of the youngest child, who is in Florida, and the testimony should be developed and weighed in accordance with the guidelines we offered in *Rose v. Rose*, 176 W.Va. 18, 21 n. 4, 340 S.E.2d 176, 179 n. 4 (1985), *see supra* note 6.

Affirmed in part; Reversed in part and Remanded.

MILLER, J., concurs and reserves the right to file a concurring opinion.

MILLER, Justice, concurring:

While I concur with the majority's Syllabus, I would solve this issue on a different basis.

There is no question, as the majority points out in note 13 of its opinion, that at the time the wife filed for divorce and child custody in Wood County in October, 1983, the circuit court was the "home state" under W.Va.Code, 48–10–2(5) (1981),[1] of the Uniform Child Custody Jurisdiction Act (UCCJA). This was and had been the domicile of the parties and the children since at least July, 1972, when the parties were married in Wood County.

The fact that the father one month later "snatched" the children from their mother and took them to Florida where he concealed them would not destroy West Virginia's "home state" jurisdiction. The fact that the family law master and the judge of the circuit court erroneously thought a custody determination could not be made because the children were not within the state would also not defeat West Virginia's "home state" jurisdiction as the suit was never dismissed.[2]

It is clear under the UCCJA, as set out in W.Va.Code, 48–10–6(a), that once West Virginia had "home state" jurisdiction and so long as the custody issue was pending, Florida under the UCCJA "shall not exercise its jurisdiction."[3] It is uniformly held that where a court is exercising jurisdiction in substantial conformity with the UCCJA, another state could should not intervene. *Morgan v. Morgan,* 666 P.2d 1026 (Alaska 1983); *Lopez v. District Court, Fourth Judicial Dist., etc.,* 199 Colo. 207, 606 P.2d 853 (1980); *Steele v. Steele,* 250 Ga. 101, 296 S.E.2d 570 (1982); *Levinson through Levinson v. Levinson,* 354 Pa.Super. 407, 512 A.2d 14 (1986); *see generally* Annot., 96 A.L.R.3d 968 § 6 (1979).

Thus, to my mind, there is no need for the majority to consider whether the mother met the six-month requirement of W.Va. Code, 48–10–3(a), since her custody suit was never dismissed. The fact that there had been a final divorce decree did not mean that the court abandoned its custody jurisdiction. The mother's motion to the court to consider the custody issue in July, 1987, did not constitute a new suit, such that she had to meet the terms of W.Va. Code, 48–10–3(a).

The delay in determining the custody issue in West Virginia was not a result of any bad faith on the mother's part. It was caused, as earlier pointed out, by an erroneous legal conclusion on the part of the family law master and circuit judge that custody could not be determined because the children were not currently within the jurisdiction.

To allow the father to benefit from this delay after he created it by kidnapping and concealing the children in Florida for over three years would destroy the very purpose of the UCCJA. The Act specifically recognizes the doctrine of unclean hands and admonishes a court to refrain from jurisdiction "[i]f the petitioner for an initial decree

---

**1.** Under W.Va.Code, 48–10–2(5) (1981), the "home state" is defined as:

> "the state in which the child immediately preceding the time involved lived with his parents, a parent or a person acting as a parent for at least six consecutive months and, in the case of a child less than six months old, the state in which the child lived from birth with any of the persons named. Periods of temporary absence of any of the named persons are counted as part of the six-month or other period[.]"

The term "time involved" is the date when the suit was filed seeking child custody.

**2.** The majority acknowledges this fact in note 1, *citing* W.Va.Code, 48–10–3(c) (1981), which states: "Physical presence of the child, while desirable, is not a prerequisite for jurisdiction to determine his custody."

**3.** W.Va.Code, 48–10–6(a), provides:

> "A court of this State shall not exercise its jurisdiction under this article if at the time of filing the petition a proceeding concerning the custody of the child was pending in a court of another state exercising jurisdiction substantially in conformity with this article, unless the proceeding is stayed by the court of the other state because this State is a more appropriate forum or for other reasons."

Florida has a similar provision in *Fla.Stat.Ann.* § 61.1314(1) (West 1985).

has wrongfully taken the child from another state or has engaged in similar reprehensible conduct[.]" W.Va.Code, 48–10–8(a).[4]

For these reasons, I do not share the majority's view that another hearing is necessary in order to show that the circuit court acted in the best interest of the children. To my mind, the circuit court acted properly and we have no obligation to give full faith and credit to the Florida decree,[5] since it had no initial jurisdiction under the UCCJA under the Florida counterpart to W.Va.Code, 48–10–6(a). *See* note 3, *supra*.

---

**4.** The Florida statutory counterpart is *Fla.Stat. Ann.* § 61.1318 (West 1985).

**5.** It appears that the Florida courts have had a history of ignoring out-of-state custody decrees, as evidenced by these quotations from an article by Elizabeth S. Baker entitled *Does Florida Create Intractable Jurisdictional Deadlocks?* in the March 1988 Florida Bar Journal:

> "Florida appellate courts recognize that Florida has been widely known as a state that shows disdain for the custody decisions of sister states, to the point that a Florida litigant can successfully obtain a trial de novo on custody issues despite the existence of out-of-state decrees. The Uniform Child Custody Jurisdiction Act was designed to remedy that problem.
>
> \*    \*    \*    \*    \*    \*
>
> "The 10 years following Florida's enactment of the UCCJA have brought little decisional harmony, with the result that Florida often

incorrectly exercises jurisdiction over children who are physically present within its borders even though courts in other states are properly exercising jurisdiction regarding those children. . . .

\*    \*    \*    \*    \*    \*

> "Trial courts in Florida have difficulty recognizing that a child who is physically present in Florida is not necessarily under the jurisdiction of the Florida courts.
>
> \*    \*    \*    \*    \*    \*
>
> ". . . Florida's record of failing to follow the UCCJA makes it a candidate for further scrutiny by federal courts. In short, it is time for Florida to give appropriate recognition to sister state custody decrees." The Florida Bar Journal/March 1988 at 43–45. (Footnotes omitted).

*See Bretti v. MacDonald,* 501 So.2d 168 (Fla.App. 1987); *Hickey v. Baxter,* 461 So.2d 1364 (Fla. App.1984); *Barnes v. Ostrander,* 450 So.2d 1253 (Fla.App.1984).