327 S.E.2d 675

**Douglas E. ARBOGAST**

v.

**Jacquelyn J. ARBOGAST.**

**No. 16091.**

Supreme Court of Appeals of
West Virginia.

Nov. 14, 1984.

Rehearing Denied Dec. 21, 1984.

**500**

Jeffrey S. Bowers, Sponaugle, Sponaugle & Bowers, Franklin, for appellant.

Richard H. Lorensen, James Gerl, Carole Scotti, Lewisburg, Carlos Jones, Arbovale, for appellee.

HARSHBARGER, Justice:

· Douglas E. Arbogast appeals from a final order of the Circuit Court of Pocahontas County, entered March 22, 1983, that permitted Jacquelyn J. Arbogast to retain custody of the parties' infant son as awarded to her in a divorce decree by a Kansas court entered February 24, 1982. He contends that our circuit court should have enforced the Kansas court's custody modification order of August 18, 1982, that awarded him custody of his son.

The Arbogasts, West Virginians, were married on March 29, 1980, at Oakland, Maryland and then moved to Kansas, where they established a home and where their child was born.

On December 16, 1981, Douglas petitioned the District Court of Coffey County, Kansas, for divorce and custody of the baby. He also applied for and was granted, *ex parte*, an interlocutory order prohibiting Jacquelyn from removing the child from Kansas during the pendancy of the suit. She was personally served with notice of the divorce and with the interlocutory order. The following day she took the boy and moved to her mother's home in Pocahontas County without notifying Douglas or the court.[1]

---

1. On February 12, 1982, Douglas petitioned the Kansas court to issue a rule to show cause why Jacquelyn should not be held in contempt for violating its interlocutory order. The matter was set for hearing on February 23, 1982, at which time Jacquelyn, appearing personally and by counsel, moved to vacate or modify the interlocutory order to allow her to keep the child in West Virginia pending trial on the contempt charge. The motion was granted and trial was set for April 20, 1982, at which time Jacquelyn was ordered to appear in person with the child. Douglas subsequently decided not to pursue the contempt, however, and there were no further proceedings.

On February 24, 1982, the Kansas court, specifically finding that it had jurisdiction of the subject matter and of the parties, entered a divorce decree that awarded permanent custody of the child to Jacquelyn and granted visitation rights to Douglas and his parents.

Douglas continued to live in Kansas while Jacquelyn remained for a time at her mother's home in Pocahontas County. She repeatedly refused to allow visitation by the child's paternal grandparents, who lived nearby, or by Douglas.

In May, 1982, she moved with the child to Rockingham County, Virginia. Douglas' parents sought to enforce their visitation rights under the Kansas decree in Virginia, and on July 2, 1982, the Juvenile and Domestic Relations Court for Rockingham County ordered Jacquelyn to allow them to visit as required by the Kansas decree. Although Jacquelyn was personally served with notice and was present in the Virginia court, she refused to comply with its order and a warrant for her arrest was allegedly issued. She immediately took the boy back to her mother's home in Pocahontas County.

On July 21, Douglas, still unable to get Jacquelyn's consent to see his son, petitioned the Kansas court for custody, recounting Jacquelyn's continuing refusal to let him visit. Copies of his petition and a notice of hearing were sent by first class mail to Jacquelyn at her mother's address and to her Kansas attorney. At a hearing on this petition on August 17, her lawyer appeared and unsuccessfully moved for a continuance, and the following day, the court ordered permanent custody changed to Douglas and divested Jacquelyn of visitation rights unless she applied to the Kansas court for them. Jacquelyn, still in West Virginia, refused to relinquish custody.

So, on August 20, Douglas petitioned the Pocahontas County Circuit Court for enforcement of the Kansas modification decree. After a hearing on August 23, that court, by order entered September 24, concluded that there was a genuine question about the Kansas court's jurisdiction to modify its initial divorce decree custody award, that it did not have proper Kansas documents to decide that question, and that Jacquelyn had not had reasonable time to file responsive pleadings or to question Kansas' jurisdiction. Accordingly, our court ordered custody to remain with Jacquelyn if she would post a $5,000 bond and also ordered her to allow Douglas and his parents to visit as prescribed in the first Kansas decree.

On October 28, after further proceedings, the court ordered the parties to submit memoranda about whether West Virginia was the appropriate forum to decide about modification of the Kansas custody order. Jacquelyn was again directed to comply with the initial decree's visitation provisions, but she continued not to do so.

On January 13, 1983, the parties submitted arguments about whether Kansas had jurisdiction. The circuit court, by order entered January 31, concluded that it had subject matter jurisdiction and was the appropriate forum upon its finding that Jacquelyn had "resided here for a sufficient period for this State to be the 'home state' under the Uniform Child Custody Jurisdiction Act." The court further decided that it was required to enforce the initial Kansas custody decree entered February 24, 1982, and once more ordered Jacquelyn to allow the Arbogasts to visit. By separate order entered the same day, the court noted Jacquelyn's repeated refusal to comply with its orders and numerous instances of abusive and threatening interference by her and her parents with attempted visits by Douglas and his parents. The court enjoined any such further behavior, indicating that continuation thereof could be contemptuous or culminate in change of the child's custody.

On that same day Douglas petitioned our circuit court for change of custody based on Jacquelyn's continued refusal to allow visits. But before the matter could be heard the parties agreed that the court should postpone consideration of the motion for modification pending resolution of "whether or not this Court must give full faith and credit to the prior Kansas orders

of the District Court of Coffey County, Kansas." They also agreed that no further hearings were needed and, by order entered March 22, 1983, the circuit court continued the case generally, reserving to Douglas the right to proceed with his motion for modification if the trial court decided against him. Jacquelyn continues to retain custody and to refuse visitation by Douglas Arbogast and his parents.

The principal question is whether the circuit court here was required to recognize and enforce the Kansas custody modification decree of August 18, 1982.

■ Two statutory schemes govern interstate child custody disputes in this state. The Parental Kidnapping Prevention Act of 1980 (PKPA), 28 U.S.C. § 1738A (1982), extends full faith and credit principles to child custody decrees and requires every state to recognize and enforce custody determinations of sister states which are consistent with the Act.[2] In addition, the Uniform Child Custody Jurisdiction Act (UCCJA), W.Va.Code, 48–10–1, *et seq.* (1984 Cum.Supp.), provides that foreign states' custody decrees are to be recognized and enforced by West Virginia courts if they accord with statutory provisions substantially similar to those of the UCCJA or meet UCCJA jurisdictional standards.[3]

■ The federal and the uniform acts both attempt to eliminate judicial competition and conflicting decrees in interstate child custody disputes by establishing clear, definite rules about which state has jurisdiction of a custody dispute and enforcing orders of that state. However, the PKPA is more than a mere codification of the UCCJA. "The federal act is more rigid, allows less judicial discretion, and has attempted to provide more certainty as to the jurisdiction of courts. It eliminates many instances of concurrent jurisdiction which can, and did, occur under the uniform act ...." *Mitchell v. Mitchell,* 437 So.2d 122, 126 (Ala.Civ.App.1982). As a federal jurisdictional statute, the PKPA establishes a policy of federal preemption in enforcement of out-of-state custody disputes which, under the Supremacy Clause,[4] takes precedence over state law and must be consulted first in determining whether the Kansas decree is entitled to enforcement here. *See Flood v. Braaten,* 727 F.2d 303 (3rd Cir.1984). *See also Flannery v. Stephenson,* 416 So.2d 1034 (Ala.Civ. App.1982); *Wachter v. Wachter,* 439 So.2d 1260 (La.App.1983); *Tufares v. Wright,* 98 N.M. 8, 644 P.2d 522 (1982); *Leslie L.F. v. Constance F.,* 110 Misc.2d 86, 441 N.Y.S.2d 911 (1981); *Voninski v. Voninski,* 661 S.W.2d 872 (Tenn.App.1982).

■ One of the primary distinctions between the PKPA and the UCCJA is that the federal act seems to more clearly prefer continuing jurisdiction in the state that issued a valid initial decree. Under the PKPA, enforcement of the Kansas modification decree is required if: (1) the initial custody decree was consistent with the provisions of the PKPA; (2) the Kansas court had jurisdiction under Kansas law to modify the initial decree; and (3) the child or one of the contestants has remained a resident of Kansas.[5] *See DiRuggiero v. Rodgers,* 743 F.2d 1009 (3rd Cir.1984).

---

**2.** 28 U.S.C. § 1738A(a) provides:

"The appropriate authorities of every State shall enforce according to its terms, and shall not modify except as provided in subsection (f) of this section, any child custody determination made consistently with the provisions of this section by a court of another State."

**3.** W.Va.Code, 48–10–14, provides:

"The courts of this State shall recognize and enforce an initial or modification decree of a court of another state which had assumed jurisdiction under statutory provisions substantially in accordance with this article or which was made under factual circumstances meeting the jurisdictional standards of this article, so long as this decree has not been modified in accord-ance with jurisdictional standards substantially similar to those of this article."

**4.** U.S. Const. art. VI, cl. 2.

**5.** 28 U.S.C. § 1738A provides, in part:

"*(c) A child custody determination made by a court of a State is consistent with the provisions of this section only if—*

"*(1) such court has jurisdiction under the law of such State; and*

"*(2) one of the following conditions is met:*

"(A) such State (i) is the home State of the child on the date of the commencement of the proceeding, or (ii) had been the child's home State within six months before the date of the

There is no contention that the original Kansas custody order entered February 24, 1982 was not valid under the PKPA, and it is uncontested that Douglas continued to reside in Kansas after the divorce. If Kansas had jurisdiction under its own law to modify that decree, our courts are required to enforce the modification.

At the time this modification motion was made, Kansas had adopted the UCCJA in a form virtually identical to our statute. K.S.A. 38-1301 to 38-1326 [1979]. Like ours, it establishes four alternative bases for assumption of subject matter jurisdiction in an initial or modification custody proceeding.[6] The Kansas legislature also

provided that "[t]he provisions of the uniform child custody jurisdiction act notwithstanding, the district court, having assumed jurisdiction to make a custody determination regarding a child, *shall continue to have such jurisdiction until such time as a court of another state assumes jurisdiction to make a custody determination regarding such child.*" (Emphasis supplied.) K.S.A. 38-1335(a) (1981).

It seems clear that under Kansas law, K.S.A. 38-1335, the Kansas court had continuing jurisdiction to modify its initial custody decree, because no other state had attempted to assume jurisdiction of the dispute as of July 21, 1982.[7] Even absent

commencement of the proceeding and the child is absent from such State because of his removal or retention by a contestant or for other reasons, and a contestant continues to live in such State;

"(B)(i) it appears that no other State would have jurisdiction under subparagraph (A), and (ii) it is in the best interest of the child that a court of such State assume jurisdiction because (I) the child and his parents, or the child and at least one contestant, have a significant connection with such State other than mere physical presence in such State, and (II) there is available in such State substantial evidence concerning the child's present or future care, protection, training and personal relationships;

"(C) the child is physically present in such State and (i) the child has been abandoned, or (ii) it is necessary in an emergency to protect the child because he has been subjected to or threatened with mistreatment or abuse;

"(D)(i) it appears that no other State would have jurisdiction under subparagraph (A), (B), (C), or (E), or another State has declined to exercise jurisdiction on the ground that the State whose jurisdiction is in issue is the more appropriate forum to determine the custody of the child, and (ii) it is in the best interest of the child that such court assume jurisdiction; or

"(E) the court has continuing jurisdiction pursuant to subsection (d) of this section.

"(d) *The jurisdiction of a court of a State which has made a child custody determination consistently with the provisions of this section continues as long as the requirement of subsection (c)(1) of this section continues to be met and such State remains the residence of the child or of any contestant.*" (Emphasis supplied.)

6. K.S.A. 38-1303 [1979], provided:
"(a) A court of this state which is competent to decide child custody matters has jurisdiction to make a child custody determination by initial or modification decree if:
"(1) This state (A) is the home state of the child at the time of commencement of the pro-

ceeding, or (B) had been the child's home state within six months before commencement of the proceeding and the child is absent from this state because of the child's removal or retention by a person claiming the child's custody or for other reasons, and a parent or person acting as parent continues to live in this state; or

"(2) it is in the best interest of the child that a court of this state assume jurisdiction because (A) the child and the child's parents, or the child and at least one contestant, have a significant connection with this state, and (B) there is available in this state substantial evidence concerning the child's present or future care, protection, training, and personal relationships; or

"(3) the child is physically present in this state and (A) the child has been abandoned or (B) it is necessary in an emergency to protect the child because the child has been subjected to or threatened with mistreatment or abuse or is otherwise dependent and neglected; or

"(4)(A) it appears that no other state would have jurisdiction under prerequisites substantially in accordance with paragraphs (1), (2), or (3), or another state has declined to exercise jurisdiction on the ground that this state is the more appropriate forum to determine the custody of the child, and (B) it is in the best interest of the child that this court assume jurisdiction.

"(b) Except under paragraphs (3) and (4) of subsection (a), physical presence in this state of the child, or of the child and one of the contestants, is not alone sufficient to confer jurisdiction on a court of this state to make a child custody determination.

"(c) Physical presence of the child, while desirable, is not a prerequisite for jurisdiction to determine the child's custody."

7. Note that the proceeding in the courts of the Commonwealth of Virginia was merely a limited action for enforcement of the visitation provisions of the prior Kansas decree. The Virginia court's determination that the Kansas decree was entitled to recognition and enforcement

K.S.A. 38–1335(a), Kansas could modify under the UCCJA. The divorce and initial custody dispute had been heard and decided by the Kansas court and there was no doubt substantial evidence about the child's welfare available in Kansas. Douglas continued to live there and to address his complaints about visitation and custody to the Kansas court. In similar circumstances, Kansas courts have assumed jurisdiction of modification proceedings under the UCCJA.[8]

■ This does not end our inquiry, however. Before a custody decree is entitled to recognition and enforcement under the PKPA, it must be demonstrated that the decreeing court had jurisdiction of the parties as well as of the subject matter. *See, e.g., Application of Felix C.*, 116 Misc.2d 300, 455 N.Y.S.2d 234 (1982).

■ Both the PKPA and the UCCJA, as adopted in Kansas and West Virginia, require that reasonable notice and an opportunity to be heard be given to contestants in an interstate child custody dispute. 28 U.S.C. § 1738A(e); K.S.A. 38–1304 (1981); W.Va.Code, 48–10–4. The PKPA does not

specify how notice is to be given, but the UCCJA provides for notice of custody proceedings to persons outside the state:

(a) Notice required for the exercise of jurisdiction over a person outside this state shall be given in a manner reasonably calculated to give actual notice, and may be:

(1) By personal delivery outside this state in the manner prescribed for service of process within this state;

(2) in the manner prescribed by the law of the place in which the service is made for service of process in that place in an action in any of its courts of general jurisdiction;

(3) by any form of mail addressed to the person to be served and requesting a receipt; or

(4) as directed by the court, including publication, if other means of notification are ineffective.

(b) Notice under this section shall be served, mailed, or delivered, or last published at least thirty (30) days before any hearing in this state.

\*       \*       \*       \*       \*       \*

---

was implicitly predicated upon a determination that the Virginia courts either did not have jurisdiction or would decline to exercise such jurisdiction. For a discussion of the limited nature of an enforcement action and the procedures to be used, *see Wyatt v. Falhsing*, 396 So.2d 1069 (Ala.Civ.App.1981).

8. In *Larsen v. Larsen*, 5 Kan.App. 284, 615 P.2d 806 (1980), which was decided prior to the enactment of K.S.A. 38–1335(a), the Kansas Court of Appeals concluded that K.S.A. 38–1314, the equivalent of W.Va.Code, 48–10–14 cited in footnote 3, *supra*, indicated a preference for the state of the original decree unless it had lost jurisdiction or was an inconvenient forum. The court concluded that Kansas retained jurisdiction under K.S.A. 38–1303(a)(2) by virtue of the children's "significant connection" with Kansas as evidenced by the fact that the children were born in Kansas and spent their early years there, that the divorce and custody decrees were rendered by Kansas courts, that the mother had continued to reside in Kansas and that there was undoubtedly substantial evidence available in Kansas as to the children's present and future well-being.

Note that in this case, as in *Larsen*, Kansas was unable to assume "home state" jurisdiction under K.S.A. 38–1303(a)(1). K.S.A. 38–1302(e) defines "home state" as:

"[T]he state in which the child immediately preceding the time involved lived with his or her parents, a parent, or a person acting as parent, for at least six consecutive months, and in the case of a child less than six months old the state in which the child lived from birth with any of the persons mentioned. Periods of temporary absence of any of the named persons are counted as part of the six-month or other period."

Since at the time of the modification proceeding here, the child had been absent from Kansas for over seven months, Kansas did not qualify as the child's "home state".

Neither does it appear that West Virginia was the child's "home state" under the almost identical provisions of our UCCJA, W.Va.Code, 48–10–2(5) and 48–10–3(a)(1). After leaving Kansas in December, 1981, Jacquelyn and her son resided in Pocahontas County for approximately five months. They then moved to Rockingham County, Virginia, where they established a residence for approximately two months. Jacquelyn did not return to Pocahontas County to live until a matter of days before the custody modification proceedings were instituted in Kansas. Thus, on July 21, 1982, the child had never lived in West Virginia for the requisite period of six consecutive months. Accordingly, the circuit court here erred in concluding that West Virginia was the child's home state.

(d) Notice is not required if a person submits to the jurisdiction of the court. K.S.A. 38–1305.

This record shows that notice of the modification hearing was mailed to Jacquelyn on July 21, 1982, less than thirty days before the hearing was conducted. Consequently, the notice did not meet the requirements of K.S.A. 1305(b). But, there was no objection to the court's jurisdiction or complaint about sufficiency of the notice, and Jacquelyn's Kansas lawyer appeared generally on her behalf at the hearing and argued for a continuance. In both his written motion and his oral arguments, he indicated Jacquelyn's intention to defend against the motion for custody change and that he was appearing at the request of her West Virginia attorney. *See* K.S.A. 38–1305(d), *supra.*

So Jacquelyn had actual notice and submitted to Kansas jurisdiction. *See Meyer v. Schmidt,* 184 Kan. 21, 334 P.2d 345 (1959). Accordingly, we conclude that the Kansas district court had jurisdiction under its own law of both the subject matter and the parties.

■ Jacquelyn also contends that the Kansas decree is not entitled to enforcement here because it is "punitive", prompted solely by her refusal to comply with court orders rather than upon any determination of whether the best interests of the child would be served by a custody change. Several states have held that the UCCJA does not require enforcement of such decrees. *See, e.g., In re Lemond,* 395 N.E.2d 1287 (Ind.App.1979); *Slidell v. Valentine,* 298 N.W.2d 599 (Iowa 1980); *Holt v. District Court,* 626 P.2d 1336 (Okla.1981); *Brooks v. Brooks,* 20 Or.App. 43, 530 P.2d 547 (1975). *See also* Commissioners' Notes, UCCJA § 13, 9 U.L.A. 152 (1979).

We are not certain that the Kansas modification decree is within this "punitive decree" exception.

This principle ... is narrow; foreign decrees are punitive only if a sister state changes or awards custody, without regard to the best interest of · the child, solely to punish one parent for disregarding its authority .... [It] applies only

when a court deprives a parent of custody primarily on the ground that he or she violated some provision of [a] prior decree or moved from [the] jurisdiction, whether or not the departure contravened a court order, and not merely because a decree reflects that the court disapproves of a parent's conduct .... *Spaulding v. Spaulding,* 460 A.2d 1360, 1367 (Me.1983).

This custody change does not appear to have been ordered because of any isolated or technical disregard of the district court's authority, but because Jacquelyn consistently and willfully refused to allow her son any contact with the Arbogast family, denying her son the right to know and share the companionship, affection and society of his father and his paternal grandparents. A mother's "very act of preventing ... children of tender age from seeing and being with their father is an act so inconsistent with the best interests of the children as to, per se, raise a strong probability that the mother is unfit to act as custodial parent." *Entwhistle v. Entwhistle,* 61 A.D.2d 380, 384–385, 402 N.Y.S.2d 213, 216 (1978). *See also Moffat v. Moffat,* 27 Cal.3d 645, 165 Cal.Rptr. 877, 612 P.2d 967 (1980); *In re Marriage of Ciganovich,* 61 Cal.App.3d 289, 132 Cal.Rptr. 261 (1976). Jacquelyn's reprehensible conduct was far more insulting to her child than to any court.

■ Moreover, the PKPA (28 U.S.C. § 1738A), makes no distinction between punitive decrees and other court orders. It merely requires that a custody decree of a sister state be enforced here if such decree meets PKPA requirements.

■ Is Douglas entitled to an award of attorney fees and travel expenses? Such an award is clearly authorized by W.Va. Code, 48–10–16(b):

A person violating a custody decree of another state which makes it necessary to enforce the decree in this State may be required to pay necessary travel and other expenses, including attorneys' fees, incurred by the party entitled to the custody or his witnesses.

The determination of a reasonable amount of fees, costs and expenses is left to the circuit court.

In summary, then, we conclude that the Circuit Court of Pocahontas County should have recognized and enforced the August 18, 1982 child custody modification decree of the District Court of Coffey County, Kansas. The circuit court shall immediately order that the child be delivered to Douglas Arbogast, and order such police help and protection as is necessary to effect the child's return to his father. The circuit court is further instructed to determine the costs, fees and expenses, if any, incurred by Mr. Arbogast in securing enforcement of the Kansas decree in this state and to make whatever award the court deems reasonable. No stay of this order is to be allowed pending any rehearing in this Court.

Reversed and remanded with instructions.