465 S.E.2d 210

**SHEILA L., on Behalf of RONALD M.M., An Infant, Petitioner Below, Appellant,**

v.

**RONALD P.M., Respondent Below, Appellee.**

No. 22794.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 12, 1995.

Decided Oct. 27, 1995.

212

George J. Cosenza, Parkersburg, for Appellant.

No appearance by Appellee.

CLECKLEY, Justice:

This appeal is brought by the petitioner below and appellant herein, Sheila L.,[1] who requests this Court to reverse the order of the Circuit Court of Wetzel County filed on November 9, 1994, which dismissed her petition for custody of her son, Ronald M.M. The circuit court dismissed her petition after determining it is required to give full faith and credit to a final order entered on June 10, 1994, by the Court of Common Pleas of Jefferson County, Juvenile Division, for the State of Ohio. The final order issued in Ohio awarded legal custody of Ronald M.M. to his biological father, Ronald P.M., who was the respondent below and is the appellee herein.[2]

## I.

### FACTUAL AND PROCEDURAL BACKGROUND

This case represents yet another tragic situation of a child who has fallen prey to the increasing problems associated with interstate custody disputes. Ronald M.M. was born May 2, 1990, in Ohio. His parents were not married at the time of his birth, but they both resided in Ohio. In a home study dated June 9, 1994, conducted by Mariann Price, the Assistant Director of Admissions for the Florence Crittenton Home & Services located in Wheeling, West Virginia, the petitioner reported that she and the respondent lived together for approximately five months after Ronald M.M.'s birth.

On August 27, 1990, Sheila L. filed a parentage action against the respondent in the Ohio Court of Common Pleas of Jefferson County. The respondent denied paternity until genetic testing was performed. On February 11, 1992, the respondent acknowledged paternity. According to the petitioner's brief, it appears that Ronald M.M.'s custody was never at issue in the parentage action and a formal custody award was not made to either parent. Nevertheless, it is evident that Ronald M.M. continued to reside with the petitioner.

During the fall of 1992, the petitioner moved to West Virginia with Ronald M.M. and another son, Joshua, who was approximately four years old. The respondent is not the biological father of Joshua, and custody of Joshua is not in dispute.

According to Ms. Price's home study, problems arose when both Ronald M.M. and his half-brother Joshua were visiting the respondent at his house. During this visit, which appears to have occurred in May of 1993, the respondent's wife discovered the children "engaged in some sexual exploration." When the petitioner was informed of the behavior, she asked the children where they learned it. Ronald M.M. made a reference to the petitioner's stepfather, but Joshua denied the occurrence.

The petitioner took the appropriate action by terminating contact between her sons and her stepfather and contacted Northwood Health Systems to obtain counseling for the boys. By letter dated August 5, 1993, Sherry A. Croasmun, a child therapist, confirmed she saw Ronald M.M. on May 26, 1993; June 7, 1993; and June 16, 1993. She stated that Ronald M.M. "was not able to verbalize or confirm any information in regards to the alleged abuse ... [and she] recommend[ed] that a qualified evaluation be conducted to make a determination regarding the occurrence of abuse."

In late June of 1993, the petitioner took Ronald M.M. to Ohio for an intended one-week visit with the respondent. On July 1, 1993, Ronald P.M. requested and received an emergency *ex parte* order from the Ohio Court of Common Pleas granting him tempo-

---

1. We follow our traditional practice of protecting the identities of the parties in cases involving sensitive facts. *See In re Jonathan Michael D.*, 194 W.Va. 20, 459 S.E.2d 131 (1995); *State v. Derr*, 192 W.Va. 165, 451 S.E.2d 731 (1994).

2. Neither counsel for the respondent nor the respondent, Ronald P.M., made an appearance or filed pleadings before this Court.

rary custody of Ronald M.M. By affidavit, Ronald P.M. informed the Ohio Court of Common Pleas that he had learned Ronald M.M. was the victim of sexual molestation that directly involved Sheila L. or a member of her family. He further averred that he believed Ronald M.M. was in "eminent [*sic*] danger of physical harm," was previously abused, and would "suffer physical injury and future potential sexual abuse" if a temporary order was not granted. In his petition, he also requested permanent custody of Ronald M.M.[3]

On or about July 2 or 3, 1993, Sheila L. returned to Ohio to pick up Ronald M.M., but instead she was given the papers awarding temporary custody to Ronald P.M. Therefore, she was unable to bring Ronald M.M. back to West Virginia with her.

On July 19, 1993, Sheila L. filed a petition for custody of Ronald M.M. with the circuit court in West Virginia. On August 18, 1993, the circuit court entered an order which stated, *inter alia*, that in accordance with the Uniform Child Custody Jurisdiction Act, W.Va.Code, 48–10–1, *et seq.*,

> "it is in the best interest of the child that a Court in the State of West Virginia assume jurisdiction because the child and his mother have a significant connection with this State and there is available in this State, substantial evidence concerning the child's present and future care, protection, training and personal relationships."

The order further requested the Ohio Court of Common Pleas to stay any further proceedings and permit the circuit court in West Virginia to adjudicate the issues in controversy.

By letter dated September 14, 1993, the Honorable Judge Samuel W. Kerr of the Court of Common Pleas responded to the action in West Virginia by stating that the Court of Common Pleas would retain continuing jurisdiction of the matter as a result of the original parentage action filed by Sheila L. Judge Kerr also wrote that under Ohio law the best interests of the child required continuing jurisdiction in Ohio and Ohio would proceed to determine the custody issue.

On October 8, 1993, an evidentiary hearing was held in Ohio. At that hearing, Sheila L. appeared, but she asserts that she did not consent to jurisdiction. As evidenced by the court referee's report dated May 23, 1994, testimony was taken from Sheila L. and Ronald P.M. at that hearing. The referee's report also indicates a second evidentiary hearing was held on May 6, 1994.

At the second hearing, the referee was advised that the State of West Virginia would not conduct a home study of Sheila L. in spite of a court order by Ohio and "proper documentation regarding the interstate compact on home studies outside the state of Ohio ... had all been completed and sent to proper authorities in West Virginia." Sheila L.'s counsel[4] apparently informed the referee that West Virginia no longer conducts interstate home studies in private matters such as this case. Due to the lack of a home study on Sheila L., her counsel requested the court grant a continuance until a home study could be completed. This request was denied, even though he stated that Ms. Price would conduct a home study and he submitted a letter from her. The hearing proceeded with testimony taken from Ronald M.M.'s babysitter and additional testimony from Sheila L.

Even without the favorable home study conducted on Sheila L.,[5] in his report, the referee made several conclusions of law that supported her, including "there can be no finding that the child, Ronald [M.M.] is an

---

3. Ronald P.M.'s request for "permanent" custody was treated as a request for commitment of legal custody under the laws of Ohio. This distinction does not affect the outcome of this opinion.

4. Sheila L. is represented by different counsel on appeal.

5. At the end of the hearing, testimony was closed, subject to being reopened when a home study on Sheila L. was concluded. As previously mentioned the referee's report was filed on May 23, 1994, while the letter attached to the home study performed by Ms. Price was dated June 9, 1994. The referee stated in his report that if the parties desired to cross-examine the person who conducts the home study, they should do so promptly as the Court of Common Pleas is obligated to review his report and make a decision after fourteen days.

abused, neglected, or dependent child," and "it was not established that the mother, Sheila [L.], is an unfit mother." The referee then continued by finding Sheila L. had sole legal custody of the child and Ronald P.M. did not participate in child rearing until the time emergency custody was given to him. As a result of these findings, the referee stated he was treating the case as if it was a proceeding to modify or change the parental rights of the parties. In this light, the referee cited various Ohio statutes and case law and found that since July of 1993 Ronald M.M. had become integrated with the Ronald P.M. and his family. Therefore, the referee concluded "it is for the best interest of the child to change [custody] ... and let the child live in a stable environment with [Ronald P.M.]; he having previously led a nomadic life moving from apartment to apartment with his mother."

The referee apparently made his conclusions without regard to the fact that the child was living with Ronald P.M. based upon unsubstantiated allegations in the emergency petition. In fact, as previously mentioned, the referee himself found insufficient evidence to show Sheila L. was unfit or Ronald M.M. was abused, neglected, or dependent. Moreover, the referee seemed to give no weight to the fact that Sheila L. lived what he referred to as a "nomadic life" because Ronald P.M. appears to have provided her with a woefully inadequate amount of child support.[6] Indeed, even in the facts of his report, the referee states:

> "[Sheila L.] gave a satisfactory explanation as to why she moved from place to place, the reason primarily was financial; she worked, she received welfare, there were times when she did not work and she did not receive welfare and it was very difficult for her to maintain any type of living quarters including rent and utilities, as well as groceries for her and her two children. The witness relates that there were also

medical bills and medicine during these periods of time."

After making his conclusions of law, the referee recommended legal custody be committed to Ronald P.M. with visitation granted to Sheila L. On June 10, 1994, the Court of Common Pleas approved and adopted the referee's report.[7] This decision was not appealed and became a final order.

On August 3, 1994, Sheila L. filed an amended petition for custody with the circuit court in West Virginia and attached the completed home study performed by Ms. Price. Without knowledge that a legal custody award was made in Ohio to Ronald P.M., the circuit court issued an *ex parte* order on that same day that stated custody of Ronald M.M. should be with the petitioner pending a hearing. The respondent filed a motion to dismiss the amended petition with the circuit court on the basis that the custody issue already was resolved in Ohio and res judicata applied. Upon learning of the June 10, 1994, custody order, the circuit court, by order dated August 19, 1994, vacated its order dated August 3, 1994, except as to the extent a hearing was scheduled on the matter.

A hearing was held before the circuit court on October 7, 1994. By order entered November 9, 1994, the circuit court determined it was required to give full faith and credit to the Ohio order. Therefore, it granted the respondent's motion to dismiss and the petitioner brings this appeal.

## II.

## DISCUSSION

The issue before this Court is whether, in light of the "home state," continuing, and emergency jurisdiction provisions of the Parental Kidnapping Prevention Act of 1980 (PKPA), 28 U.S.C. § 1738A, the circuit court erred when it determined it must give full faith and credit to the Ohio order. The petitioner relies upon the Uniform Child

---

**6.** The referee's report contains statements that imply Sheila L. received child support ranging from nothing per month to an average high of $97 per month in 1993. In addition, the petitioner asserts in her brief to this Court that while Ronald P.M. was ordered to pay $201 per month in child support, he only made such payments for two months prior to receiving emergency custody of the child.

**7.** There is no mention in the order that the Court of Common Pleas reviewed Ms. Price's home study dated June 9, 1994.

Custody Jurisdiction Act (UCCJA), which is the state-enacted predecessor to the federal PKPA, to argue that the circuit court was not required to give the Ohio order full faith and credit because the Ohio court's claim of jurisdiction is inconsistent with the UCCJA.[8] Therefore, the petitioner maintains her amended petition for custody should not have been dismissed. This case involves mixed questions of law and fact that require the consideration of legal concepts and statutory construction. Therefore, our review is plenary. *See Burnside v. Burnside,* 194 W.Va. 263, 265, 460 S.E.2d 264, 266 (1995).

We begin our analysis with a few preliminary points. Prior to our adoption of the UCCJA in 1981, West Virginia applied the Full Faith and Credit Clause in Section 1 of Article IV of the United States Constitution[9] to the child custody arena. In *Stewart v. Stewart,* 169 W.Va. 1, 4, 289 S.E.2d 652, 654 (1980), we identified the two primary goals of the full faith and credit doctrine that previously were set forth by the United States Supreme Court.[10] "First, it acts as a nationally unifying force to keep the various states from ignoring judicial decrees rendered outside their border." 169 W.Va. at 4, 289 S.E.2d at 654, *citing Sherrer v. Sherrer,* 334 U.S. 343, 355, 68 S.Ct. 1087, 1092–93, 92 L.Ed. 1429, 1438 (1948). "Second, it is designed to bring about an end to litigation,

thereby giving finality to court proceedings." 169 W.Va. at 4, 289 S.E.2d at 654, *citing Riley v. New York Trust Co.,* 315 U.S. 343, 348–49, 62 S.Ct. 608, 612, 86 L.Ed. 885, 891 (1942).

■ These goals are important and essential to our administration of justice. However, as we said in *Stewart,* "a state need not blindly accept the jurisdictional assertions contained in the judgment of the sister state." 169 W.Va. at 5, 289 S.E.2d at 654. Jurisdictional issues can be challenged to the extent they were not fairly litigated in the sister state. 169 W.Va. at 5, 289 S.E.2d at 654, *citing Durfee v. Duke,* 375 U.S. 106, 111, 84 S.Ct. 242, 245, 11 L.Ed.2d 186, 191 (1963).[11] In recognizing the importance of the full faith and credit doctrine, but also its jurisdictional limits, we reiterated in *Stewart* the first three Syllabus Points of *State ex rel. Lynn v. Eddy,* 152 W.Va. 345, 163 S.E.2d 472 (1968):

" '1. Under Article IV, Section 1, of the Constitution of the United States, a valid judgment of a court of another state is entitled to full faith and credit in the courts of this State.'

" '2. "Full faith and credit must be given to the judgment or decree of a sister state if it is not successfully attacked on jurisdictional grounds." Point 4, syllabus,

---

**8.** Both West Virginia and Ohio adopted the UCCJA. It is codified in W.Va.Code, 48–10–1, *et seq.,* and in Ohio Rev.Code §§ 3109.21 through 3109.37.

**9.** Section 1 of Article IV states, in part: "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State."

**10.** In *Stewart,* we were asked by certified question "whether a decree by a Virginia court that permitted a second husband to adopt his wife's child over the objection of her former husband, the natural father, is entitled to full faith and credit in this State." 169 W.Va. at 2, 289 S.E.2d at 653. The trial court apparently determined the Virginia decree was not entitled to full faith and credit because it was based upon an unconstitutionally vague Virginia statute. We reversed the circuit court's answer to the certified question on the grounds that Virginia's judgment could not be attacked in West Virginia under full faith and credit principles by arguing it was based upon an unconstitutional statute going to

the merits of the action rather than going to the jurisdiction of Virginia to enter a judgment. *See* Syl. pt. 4, *Stewart, supra.* The natural father did not contest personal or subject matter jurisdiction in Virginia nor did he assert Virginia assumed jurisdiction by fraud.

**11.** We quoted the following passage from *Durfee,* 375 U.S. at 111, 84 S.Ct. at 245, 11 L.Ed.2d at 191:

" '[W]hile it is established that a court in one State, when asked to give effect to the judgment of a court in another State, may constitutionally inquire into the foreign court's jurisdiction to render that judgment, the modern decisions of this Court have carefully delineated the permissible scope of such an inquiry. From these decisions there emerges the general rule that a judgment is entitled to full faith and credit—even as to questions of jurisdiction—when the second court's inquiry discloses that those questions have been fully and fairly litigated and finally decided in the court which rendered the original judgement.' " *Stewart,* 169 W.Va. at 5, 289 S.E.2d at 654.

Brady v. Brady, 151 W.Va. 900, 158 S.E.2d 359 [ (1967) ].'

" '3. By virtue of the full faith and credit clause of the Constitution of the United States, a judgment of a court of another state has the same force and effect in this State as it has in the state in which it was pronounced.' "

Thus, it is clear that even prior to our adoption of the UCCJA, it was the practice in West Virginia not to apply the full faith and credit doctrine if we found the foreign court lacked jurisdiction and did not fully and fairly litigate the issues.

Historically, the Full Faith and Credit Clause proved to be unsuccessful in curbing the increasing problems associated with interstate conflicts over child custody cases. Consequently, in 1968, the National Conference of Commissioners on Uniform State Laws and the American Bar Association approved the UCCJA. The Prefatory Note to the model UCCJA, 9 *U.L.A.* 118 (1988), in part, explains:

"The Act is designed to bring some semblance of order into the existing chaos. It limits custody jurisdiction to the state where the child has his home or where there are other strong contacts with the child and his family. See Section 3 [W.Va. Code, 48–10–3]. It provides for the recognition and enforcement of out-of-state custody decrees in many instances. See Sections 13 and 15 [W.Va.Code, 48–10–14, and 48–10–16]. Jurisdiction to modify decrees of other states is limited by giving a jurisdictional preference to the prior court under certain conditions. See Section 14 [W.Va.Code, 48–10–15]. Access to a court may be denied to petitioners who have engaged in child snatching or similar practices. See Section 8 [W.Va.Code, 48–10–8]. Also, the Act opens up direct lines of communication between courts of different states to prevent jurisdictional conflict and bring about interstate judicial assistance in custody cases."

As described in the Prefatory Note, the purpose of the jurisdictional prerequisites and requirements contained within the UCCJA is to prevent conflicts and promote cooperation among states that become entangled in the same custody dispute.

As part of its design, the UCCJA provides a statutory basis for the recognition and enforcement of out-of-state decrees. Whether this State shall recognize an out-of-state decree is contained in W.Va.Code, 48–10–14 (1981), which provides:

"The courts of this State shall recognize and enforce an initial or modification decree of a court of another state which had assumed jurisdiction under statutory provisions substantially in accordance with this article or which was made under factual circumstances meeting the jurisdictional standards of this article, so long as this decree has not been modified in accordance with jurisdictional standards substantially similar to those of this article."

W.Va.Code, 48–10–14, virtually is identical to Section 13 of the model UCCJA.[12] The Comment following Section 13 of the model UCCJA explains that states are not necessarily required to recognize and enforce out-of-state custody decrees under the Full Faith and Credit Clause. However, under Section 13 of the UCCJA, it becomes "a matter of state law, that custody decrees of sister states will be recognized and enforced" in those states that adopt the Act so long as the sister state complies with the jurisdictional standards of the Act.[13] 9 *U.L.A.* 276.

In *Arbogast v. Arbogast*, 174 W.Va. 498, 502, 327 S.E.2d 675, 679 (1984), we held that the UCCJA "provides that foreign states' custody decrees are to be recognized and enforced by West Virginia courts if they

**12.** The only difference between W.Va.Code, 48–10–14, and the model Act is the substitution of the word "article" for "Act."

**13.** For a *modification* of a prior custody award, we stated in Syllabus Point 2 of *In the Interest of Brandon L.E.*, 183 W.Va. 113, 394 S.E.2d 515 (1990):

"Notwithstanding their intent to require states adopting the Uniform Child Custody Jurisdiction Act to recognize custody decrees entered by sister states, the Act's drafters in no uncertain terms provided jurisdiction to both the original 'custody court' and other courts to determine whether modification of the initial custody decree is in the best interest of the child."

accord with statutory provisions substantially similar to those of the UCCJA or meet UCCJA jurisdictional standards." (Footnote omitted). However, the UCCJA is not the only statutory scheme applicable to interstate custody disputes in West Virginia. Indeed, the PKPA plays a vital role in child custody disputes. Similar to the UCCJA, we stated in Syllabus Point 1 of *Arbogast:*

> "The Parental Kidnapping Prevention Act of 1980, 28 U.S.C. § 1738A (1982), extends full faith and credit principles to child custody decrees and requires every state to enforce sister state custody determinations that are consistent with the act."[14]

In spite of some similarities, the UCCJA and the PKPA are not identical acts.

In *Arbogast,* 174 W.Va. at 502, 327 S.E.2d at 679, we found the PKPA was not merely a codification of the UCCJA. The PKPA " 'is more rigid, allows less judicial discretion, and has attempted to provide more certainty as to the jurisdiction of courts. It eliminates many instances of concurrent jurisdiction which can, and did, occur under the uniform act....' *Mitchell v. Mitchell,* 437 So.2d 122, 126 (Ala.Civ.App.1982)." 174 W.Va. at 502, 327 S.E.2d at 679. Where the UCCJA and the PKPA differ, we held that the PKPA preempts state laws by virtue of the Supremacy Clause,[15] and, therefore, must be consulted first when deciding if a judgment of a foreign court should be enforced.

It is important to understand that the PKPA applies to more than instances of child kidnapping. As the Supreme Court of Georgia in *Wilson v. Gouse,* 263 Ga. 887, 889, 441 S.E.2d 57, 60 (1994), recently explained, the PKPA was adopted as a result of the failures of the UCCJA. "[C]ourts differed in their interpretation of the UCCJA's jurisdictional requirements and many states that adopted the UCCJA made substantive modifications which diluted the uniformity the UCCJA was intended to promote." 263 Ga. at 889, 441 S.E.2d at 59. This history combined with a "complete absence of any language restricting the applicability of the PKPA to circumstances in which a child is kidnapped," indicates that "the PKPA was intended not only to apply where a child was abducted by a parent and removed to another state but to remedy what was widely considered to be the inapplicability of the full faith and credit statute to child custody orders."[16] 263 Ga. at 889, 441 S.E.2d at 60, *citing Thompson v. Thompson,* 484 U.S. 174, 181, 108 S.Ct. 513, 517, 98 L.Ed.2d 512, 521 (1988).

■ In the present case, the relevant language of the PKPA is found in 28 U.S.C. § 1738A(c), (d), and (g). These subsections state:

> "(c) A child custody determination made by a court of a State is consistent with the provisions of this section only if—
>
> "(1) such court has jurisdiction under the law of such State; and
>
> "(2) one of the following conditions is met:
>
> "(A) such State (i) is the home State of the child on the date of the commencement of the proceeding, or (ii) had been the child's home State within six months before the date of the commencement of the proceeding and the child is absent from such State because of his removal or retention by a contestant or for other reasons, and a contestant continues to live in such State;

14. 28 U.S.C. § 1738A(a) provides: "The appropriate authorities of every State shall enforce according to its terms, and shall not modify except as provided in subsection (f) of this section, any child custody determination made consistently with the provisions of this section by a court of another State."

15. U.S. Const. art. VI, cl. 2.

16. As further support, the Georgia court said in note 2, in part:
    "This statute [28 U.S.C. § 1738A], although commonly referred to as the PKPA, is codified under the title 'Full faith and credit given to child custody determinations' and is an addendum to the more general full faith and credit statute requiring states to give preclusive effect to the judicial proceedings of sister states, 28 U.S.C. § 1738. See *Thompson,* 484 U.S. at 183, 108 S.Ct. at 518[, 98 L.Ed.2d at 522] (language and placement of § 1738A alone is strong proof that it is intended to have the same operative effect as the full faith and credit statute)." 263 Ga. at 889, 441 S.E.2d at 60.

"(B)(i) it appears that no other State would have jurisdiction under subparagraph (A), and (ii) it is in the best interest of the child that a court of such State assume jurisdiction because (I) the child and his parents, or the child and at least one contestant, have a significant connection with such State other than mere physical presence in such State, and (II) there is available in such State substantial evidence concerning the child's present or future care, protection, training, and personal relationships;

"(C) the child is physically present in such State and (i) the child has been abandoned, or (ii) it is necessary in an emergency to protect the child because he has been subjected to or threatened with mistreatment or abuse;

"(D)(i) it appears that no other State would have jurisdiction under subparagraph (A), (B), (C), or (E), or another State has declined to exercise jurisdiction on the ground that the State whose jurisdiction is in issue is the more appropriate forum to determine the custody of the child, and (ii) it is in the best interest of the child that such court assume jurisdiction; or

"(E) the court has continuing jurisdiction pursuant to subsection (d) of this section.

"(d) The jurisdiction of a court of a State which has made a child custody determination consistently with the provisions of this section continues as long as the requirement of subsection (c)(1) of this section continues to be met and such State remains the residence of the child or of any contestant.

\*　　\*　　\*　　\*　　\*　　\*

"(g) A court of a State shall not exercise jurisdiction in any proceeding for a custody determination commenced during the pendency of a proceeding in a court of another State where such court of that other State is exercising jurisdiction consistently with the provisions of this section to make a custody determination."

As is evident by the above language, the PKPA gives distinct priority to the "home-State" jurisdiction of a child over another state that may have a "significant connection" to the child or have "substantial evidence" with regard to "the child's present or future care, protection, training, and personal relationships[.]" 28 U.S.C. § 1738A(c)(2)(A) and (B). The phrase "home State" is defined in 28 U.S.C. § 1738A(b)(4), in relevant part, as "the State in which, immediately preceding the time involved, the child lived with his parents, a parent, or a person acting as parent, for at least six consecutive months[.]" Upon review, we find no such priority is afforded to the "home-State" under the UCCJA.[17] Thus, the PKPA would preempt the UCCJA in this respect.

---

17. The relevant section of the UCCJA is found in W.Va.Code, 48–10–3 (1981), which provides:

"(a) A court of this State which is competent to decide child custody matters has jurisdiction to make a child custody determination by initial or modification decree if:

"(1) This State (i) is the home state of the child at the time of commencement of the proceeding or (ii) has been the child's home state within six months before commencement of the proceeding, the child is absent from this State because of his removal or retention by a person claiming his custody or for other reasons and a parent or person acting as parent continues to live in this State; or

"(2) It is in the best interest of the child that a court of this State assume jurisdiction because (i) the child and his parents, or the child and at least one contestant, have a significant connection with this State, and (ii) there is available in this State substantial evidence concerning the child's present or future care, protection, training and personal relationships; or

"(3) The child is physically present in this State, and (i) the child has been abandoned, or (ii) it is necessary in an emergency to protect the child because he has been subjected to or threatened with mistreatment or abuse or is otherwise neglected or dependent; or

"(4)(i) It appears that no other state would have jurisdiction under prerequisites substantially in accordance with subdivision (1), (2) or (3) of this subsection, or another state has declined to exercise jurisdiction on the ground that this State is the more appropriate forum to determine the custody of the child, and (ii) it is in the best interest of the child that this court assume jurisdiction.

"(b) Except under subdivisions (3) and (4) of subsection (a), physical presence in this State of the child, or of the child and one of the contestants, is not alone sufficient to confer jurisdiction on a court of this State to make a child custody determination.

It has been recognized by some states, however, that the PKPA only directly applies to modifications of prior custody awards. It does not directly apply to situations where there arise a controversy as to which state has jurisdiction to make an initial custody award. For instance, in *Columb v. Columb,* 161 Vt. 103, 108, 633 A.2d 689, 692 (1993), the Supreme Court of Vermont held "the PKPA governs the enforceability of one state's custody order in another state and the other state's power to modify that order; it does not purport to control the jurisdiction to issue an initial order." (Citation omitted). Nevertheless, the Vermont court proceeded to construe the UCCJA consistently with the PKPA "home-State" preference to avoid potential conflict with the home state.

Similarly, in *Glanzner v. State, Department of Social Services, Division of Child Support Enforcement,* 835 S.W.2d 386, 389 (Mo.App.E.D.1992), the Missouri Court of Appeals held "[t]he PKPA does not grant or deny initial jurisdiction to a state.... Rather, it governs only the enforcement and modification of foreign decrees and the treatment of concurrent proceedings." (Footnote and citations omitted). The court explained, however, that the issue presented to the court was not whether an initial decree made in California violated the UCCJA or the PKPA when it was entered, but whether it was entitled to *enforcement* in Missouri. 835 S.W.2d at 393.

Under the facts of *Glanzner,* the Missouri court found the California order was not entitled to enforcement because Missouri was the child's "home State" before the proceedings were filed, Missouri did not decline to exercise its jurisdiction, and California did not act consistently with any of the other requirements in 28 U.S.C. § 1738A(c)(2). In so holding, the Missouri court quoted the following passage from Russell M. Coombs',

*Interstate Child Custody: Jurisdiction, Recognition, and Enforcement,* 66 Minn.L.Rev. 711, 788–89 (1982):

> " 'Although possessing jurisdiction under its own law, a court in which an initial custody proceeding is filed may consider whether the exercise of that jurisdiction would be consistent with section 1738A. *The resulting decree would be entitled under the federal statute to interstate enforcement only if made consistently with section 1738A.'* " 835 S.W.2d at 393. (Footnotes omitted and emphasis supplied in *Glanzner* ).

Thus, even if California had issued its order consistent with its statutes and the UCCJA, Missouri was not bound to enforce it unless it was made consistently with the provisions of the PKPA. *See also Atkins v. Atkins,* 308 Ark. 1, 6–7, 823 S.W.2d 816, 819 (1992) (the Arkansas Supreme Court determined that "[a]lthough the PKPA only applies directly to modification proceedings, it also indirectly governs initial custody determinations ... [because] if a custody decree fails to conform to the requirements of the PKPA, it will not be entitled to full faith and credit in another state." (Citations omitted)).[18]

In West Virginia, we also have acknowledged the practical necessity of applying the PKPA to an initial custody determination. In *Sams v. Boston,* 181 W.Va. 706, 712, 384 S.E.2d 151, 157 (1989), we said:

> "[T]he Federal PKP Act gives distinct priority to the state court exercising 'home-state' jurisdiction to enter an initial custody decree [over a state that bases its jurisdiction on a 'significant connection' and 'substantial evidence' test. 28 U.S.C. § 1738A(c)(2)(A) and (B) ]. Therefore, the Federal PKP Act makes it judicially imprudent for a state court in one state to exercise jurisdiction to enter an initial cus-

"(c) Physical presence of the child, while desirable, is not a prerequisite for jurisdiction to determine his custody."

This section is substantially similar to Section 3 of the model UCCJA. Ohio also adopted a similar, but not identical provision in Ohio Rev.Code Ann. § 3109.22 (Anderson 1991).

**18.** In *Atkins,* the Arkansas court applied the PKPA to an initial custody controversy. The

court determined that under the PKPA, Arkansas was the child's "home State" and, thus, had exclusive jurisdiction over the initial custody determination even if under the UCCJA Louisiana and Arkansas might have had concurrent jurisdiction based on the child's "significant connection" with Louisiana and "substantial evidence" there. 823 S.W.2d at 819.

tody decree when a state court in another state has 'home-state' jurisdiction and has not declined to exercise that jurisdiction; if conflicting decrees were issued, only the custody decree of the 'home-state' court would be entitled to full faith and credit under the Federal PKP Act. *Mancusi v. Mancusi*, 136 Misc.2d 898, 901–04, 519 N.Y.S.2d 476, 478–79 (Fam.Ct.1987)." [19] Therefore, with the foregoing considerations, we analyze the petitioner's claim that the Ohio decree should not be afforded full faith and credit in West Virginia under the PKPA.

■ There is no doubt in this case that West Virginia was the "home State" of Ronald M.M. prior to the initiation of the custody proceedings and West Virginia did not decline to exercise its jurisdiction.[20] Moreover, although the letter dated September 14, 1993, from the Ohio Court of Common Pleas to the circuit court in West Virginia stated Ohio had continuing jurisdiction based upon the parentage action, Ohio had not entered an initial custody decree on which it could assert continuing jurisdiction under the PKPA, 28 U.S.C. § 1738A(d).

■ Under 28 U.S.C. § 1738A(d), a court may continue its jurisdiction if it has made a "child custody determination consistent with the provisions of this section," if it maintains jurisdiction under its law, and if either the child or a contestant continues to reside in the state. A "custody determination" is defined in 28 U.S.C. § 1738A(b)(3) as "a judg-ment, decree, or other order of a court providing for the custody or visitation of a child, and includes permanent and temporary orders, and initial orders and modifications[.]" The parentage action in Ohio was not a "custody determination" as defined by the PKPA. In fact, Ohio Rev.Code Ann. § 3111.13(C) (Anderson 1993), provides, in part: "After entry of the judgment or order, the father may petition that he be designated the residential parent and legal custodian of the child or for visitation rights in a proceeding *separate* from any action to establish paternity." [21] (Emphasis added). It is obvious that the custody action in the present case was separate from the parentage action. Custody did not become an issue until the emergency petition was filed—nearly seventeen months after the respondent acknowledged paternity.

■ Without "home-State" preference or continuing jurisdiction, the only other basis on which Ohio could argue it had jurisdiction under the present facts is by virtue of the emergency petition filed by the respondent. To assume jurisdiction in an emergency situation under the PKPA, 28 U.S.C. § 1738A(c)(1) and (2)(C), a state must have jurisdiction under its own law, the child must be physically present in the state, and the child must be either abandoned or in an emergency situation that necessitates action to protect the child being "subjected to or

**19.** In *Mancusi*, the Family Court of New York held the PKPA does not control jurisdiction to make an initial decree. "However, for a state's initial custody decree to be entitled under federal law to enforcement and nonmodification in another state, that state court must have exercised jurisdiction consistent with the PKPA (28 U.S.C. § 1738A[a] )." 136 Misc.2d at 902, 519 N.Y.S.2d at 478.

**20.** In the circuit court's order filed November 9, 1994, dismissing Sheila L.'s original and amended petitions for custody, the circuit court stated:

"9. The Judge of this Court communicated with Samuel W. Kerr, Judge of the Court of Common Pleas of Jefferson County, Ohio Juvenile Division, who advised the Judge of this Court that the Ohio Court had obtained first jurisdiction by virtue of the underlying paternity action and also by virtue of the action instituted by Ronald P.[M.] to obtain emergency custody. The Circuit Court of Wetzel County

did not enter an order memorializing the agreement of the two Judges that Ohio should retain jurisdiction. A letter memorializing the conversation between the two Judges was filed in this action on September 20, 1993. The Ohio Court declined to stay further proceedings and an evidentiary hearing was held in the Ohio Court on October 8, 1993[.]"

We find these statements reasonably cannot be interpreted as the circuit court declining to exercise jurisdiction in West Virginia. It is especially evident in light of the fact the circuit court had further proceedings on the case.

**21.** This quote from Section 3111.13(C), in part, remains similar to the way it was when it was enacted in 1982. The only difference between the 1982 and 1993 versions is the phrase "the father may petition that he be designated the residential parent and legal custodian" originally merely provided "the father may petition for custody[.]"

threatened with mistreatment or abuse[.]" However, we find these sections must be interpreted and applied narrowly to fulfill the goals of the PKPA and the UCCJA. Section 1738A(c)(2)(C) of the PKPA virtually is identical to Section 3(a)(3) of the model UCCJA.[22] *See* W.Va.Code, 48–10–3(a)(3) (1981); Ohio Rev. Code Ann. § 3109.22(A)(3) (Anderson 1991).

In this case, according to the original *ex parte* order dated July 1, 1993, the Court of Common Pleas granted temporary custody to Ronald P.M. based upon the totally unsubstantiated and self-serving statements made in his pleadings and his personal appearance, along with his wife's appearance, before the court to give testimony. To interpret these facts as a sufficient basis to establish jurisdiction to make a *permanent* custody award,[23] without more, would be contrary to the intent of the PKPA and the UCCJA. To hold otherwise would be a license for every unscrupulous would-be custodial parent in the country to take his or her children and make false allegations of emergency situations in states where favorable custody decisions may result. *See Ex parte J.R.W. (Re: S.C. v. J.R.W.),* 667 So.2d 74, 81 (Ala.1994), *as modified; rev'd on other grounds,* 667 So.2d 88 (Ala.1995) ("[a]llowing a state court to modify 'permanently' a prior custody determination of another court solely on the basis of the 'emergency' provision of § 1738A(c)(2)(C) would thwart the very purposes for which the PKPA was enacted." Such an interpretation would cause "havoc ... given the frequency with which allegations of abuse, particularly allegations of sexual abuse, become part of child custody litigation").

As further explained in David C. Minneman's annotation, *Abandonment and Emergency Jurisdiction of Court under § 3(a)(3) of the Uniform Child Custody Jurisdiction Act (UCCJA) and the Parental Kidnapping Prevention Act (PKPA), 28 USCS*

*§ 1738A(c)(2)(C),* 5 A.L.R.5th 788, 806–07 (1992):

"In establishing that an emergency exists sufficient to invoke emergency jurisdiction under § 3(a)(3)(ii) of the Uniform Child Custody Jurisdiction Act, self-serving statements of one parent regarding the welfare of the child while in the custody of the other parent can be expected to be insufficient to establish jurisdiction. In such a case the testimony will probably be based almost totally upon hearsay statements of the noncustodial parent, who is claiming to relate statements made to him by the child regarding the child's circumstances with the custodial parent. In such a situation there is often no other support for the claim that the child is in bad circumstances while in the custody of the other parent, and the testimony of the noncustodial parent is generally disputed by the custodial parent." (Footnotes omitted).

*See also In the Matter of Lemond,* 274 Ind. 505, 532–33, 413 N.E.2d 228, 245 (1980) (Per curiam) ("[o]nly where there is substantial evidence, not simply conclusory assertions, of an emergency, can emergency jurisdiction ... be invoked").

Based upon these principles, we hold that unsubstantiated statements of a parent that a child is being "subjected to or threatened with mistreatment or abuse,"[24] by themselves, cannot serve as a basis to invoke jurisdiction of a court to enter or modify a *permanent* custody award under the PKPA. We make it clear that a parent is not precluded merely because of unsubstantiated statements from raising allegations of mistreatment or abuse in a court that has jurisdiction to enter or modify a permanent custody award on other grounds; nor is that court prevented from considering such unsubstantiated statements in entering a *temporary* order to protect a child from an emergency situation of abuse.

---

**22.** The primary difference between the UCCJA and the PKPA is the exclusion of the language "or is otherwise neglected or dependent" as a condition of an emergency situation in the PKPA.

**23.** As previously mentioned, Ronald P.M.'s custody award was considered a commitment of legal custody in Ohio. *See* note 3, *supra.*

**24.** 28 U.S.C. § 1738A(c)(2)(C).

By our holding, we in no way mean to downplay the necessity of emergency custody orders. Such orders are absolutely critical in a world where children are subjected to mistreatment and abuse. In fact, we unequivocally hold that a court without a sufficient reason to invoke jurisdiction on other grounds is not powerless in an emergency situation. Although we interpret § 1738A(c)(2)(C) of the PKPA narrowly to adhere to the overall goals of the Act, we hold it is consistent with the intent of the PKPA that a court without jurisdiction on other grounds may invoke *temporary* emergency jurisdiction if its exercise of jurisdiction is consistent with the laws of the state where the court is located, the child is physically present in that state, and the child is in need of protection as a result of being "subjected to or threatened with mistreatment or abuse[.]" 28 U.S.C. § 1738A(c)(1) and (2)(C). We also are aware that emergency situations often initially do not provide a parent or a court with sufficient time to gather additional evidence beyond the mere statements of a parent; therefore, we further hold that a court may rely upon unsubstantiated statements to invoke emergency jurisdiction if the court finds it necessary to protect the child from actual or threats of mistreatment or abuse. If emergency jurisdiction is based upon the unsubstantiated statements of a parent, additional evidence should be gathered as quickly as reasonably possible to either affirm or negate the allegations. Moreover, temporary jurisdiction should last only so long as the emergency exists or until a court that has jurisdiction to enter or modify a permanent custody award is apprised of the situation and accepts responsibility to ensure that the child is protected.

The necessity for allowing courts to invoke temporary emergency jurisdiction also was articulated by the Supreme Court of Mississippi in *Curtis v. Curtis*, 574 So.2d 24, 28 (1990), when it stated:

"We are sensitive to the practical plight of a ... judge presented with an emergency petition such as this. He or she will necessarily hear but one side of the matter. The consequences of declining jurisdiction where a true emergency exists far outweigh the harm that may be inflicted where the court assumes a temporary jurisdiction which in time appears improvident."

However, the court in *Curtis* further explained that "[e]mergencies by definition do not last and to say that the [court] had temporary emergency subject matter jurisdiction in no way precludes plenary inquiry into the [court's] permanent subject matter jurisdiction of the court." 574 So.2d at 28. A "court should assume 'temporary jurisdiction only for the duration of the emergency and [should terminate] its jurisdiction after the emergency has passed.'" *In the Matter of E.H.*, 612 N.E.2d 174, 185 (Ind.App. 2 Dist.1993), *quoting In the Matter of Lemond*, 274 Ind. at 534 n. 15, 413 N.E.2d at 246 n. 15. *See also Ex parte J.R.W. (Re: S.C. v. J.R.W.)*, 667 So.2d at 80 ("[t]o avoid seriously abrogating the PKPA's clear and otherwise uncompromising provisions governing modification of custody determinations, any construction of 'emergency' authority under the PKPA ... would undoubtedly have to limit this authority to those temporary modifications necessary to protect the child from substantial and imminent harm").

Therefore, even if we assume that Ohio was presented with sufficient facts to "temporarily" take jurisdiction to protect Ronald M.M. from abuse, Ohio should have terminated its temporary jurisdiction once West Virginia asserted its jurisdiction. Emergency custody matters should be among those cases given priority by our court systems and should be resolved as quickly as is reasonably feasible. *See, e.g.*, Syl. pt. 1, *In the Interest of Carlita B.*, 185 W.Va. 613, 408 S.E.2d 365 (1991). A child should not be set to languish in the custody-dispute abyss for months or years while a temporary custody order is disputed.

This Court acknowledges it does not have the transcripts from the evidentiary hearings held in Ohio after Ohio "assumed its jurisdiction"; however, it appears from even what is contained within the referee's report that this case is an outrageous example of how one parent who did not participate in child rearing until the time of emergency custody

manipulated the legal system to obtain permanent legal custody. We do not dispute the child may have integrated himself into Ronald P.M.'s family; however, it is abhorrent that the reason why the integration occurred is because this child was separated from his mother and half-brother for nearly a year based upon unsubstantiated claims in an "emergency" custody petition that ultimately resulted in a permanent custody award to Ronald P.M.

### III.

### CONCLUSION

In sum, we find the Ohio order entered on June 10, 1994, is not entitled to full faith and credit under the PKPA because the Ohio court did not enter its order consistent with the PKPA. We also find West Virginia had priority in exercising its jurisdiction as the "home State" of Ronald M.M. under the PKPA; Ohio did not have continuing jurisdiction based upon the parentage action under the PKPA; and Ohio did not have subject matter jurisdiction to enter a permanent custody order pursuant to the emergency provisions of the PKPA.

For the foregoing reasons, we reverse the November 4, 1994, order of the Circuit Court of Wetzel County which dismissed the petitioner's amended petition for custody and afforded full faith and credit to the Ohio order. This case, therefore, is remanded for further proceedings as to the permanent custody of Ronald M.M.[25]

Reversed and remanded.

MILLER, Retired Justice, sitting by temporary assignment.

ALBRIGHT, J., did not participate.

---

**25.** During oral argument, counsel for the petitioner conceded there is insufficient evidence in the record to determine custody. Thus, we make no recommendation as to whom permanent custody should be awarded other than the best interests of Ronald M.M. must prevail. We also commend petitioner's counsel for his pro bono work on this case.